BURKE, Judge.
The appellant, Jerry Bohannon, appeals his convictions for two counts of murder defined as capital by § 13A-5-40(a)(10), Ala.Code' 1975, because Anthony Harvey arid Jerry DuBoise were murdered by one act or pursuant to one scheme or course of conduct. The jury recommended, by a vote of 11 tó 1, that Bohannon be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Bohannon to death. This appeal, which is automatic in a case involving the death penalty, followed. See' § 13A-5-53, Ala. Code 1975.
The State’s evidence tended to show the following. On December 11, 2010, police were dispatched to the Paradise Lounge nightclub in Mobile in response ■ to an emergency 911 telephone call informing the dispatcher that a shooting was in progress. Officer John Deputy, a former officer with the Prichard Police Department, testified that when he arrived at the lounge, he saw Bohannon standing in the parking lot with a weapon in his hand and his arm down at his side. A woman, later identified as Bohannon’s wife, was. standing in front of him and yelled: “Don’t *469 shoot.” Officer Deputy testified that two bodies were on the ground in the parking lot and that two guns, a .22 caliber derringer pistol and a .32 caliber semiautomatic pistol, were near the bodies. One victim, he said, had a gunshot wound to his chest and multiple gunshot wounds to his head. The second victim had what appeared to be a single gunshot wound to his chest and what appeared to be “footprints on his face.” (R. 1093.) Dr. John Krolikowski, a forensic pathologist, testified that Harvey died from a combination of a single gunshot wound to his chest and blunt-head trauma from multiple injuries and that DuBoise died from three gunshot wounds.
The owner of the lounge, William Graves, testified that there was an extensive security system in the lounge and that 8 cameras recorded the outside of the lounge and its parking lot and 14 or 15 cameras recorded the inside of the lounge. A customer sitting at the bar could watch a live video of the parking lot. Three recordings of the shootings from three different angles were introduced into evidence and played for the jury. Transcripts of several 911 emergency telephone calls, as the shootings were in progress, were also introduced and played to the jury.
The circuit court in its sentencing order gave the following account of the shootings as observed from the three videotapes:
“At around 7:30 a.m., according to one of the waitresses, a text came in to either DuBoise or Harvey stating that one of their girlfriends needed the car so the girlfriend could go to work. Du-Boise packed up his pool cue into a carrying case and began to leave the Lounge. Bohannon’s friend, Wade Brown, had gone outside to use his cell phone and came back into the Lounge to get his things because everyone was beginning to leave. DuBoise and Harvey came out into the parking lot in front of the Lounge and Harvey went over to their car and began examining the tire well. Bohannon, dressed in a plaid shirt and cowboy hat, came out into the parking lot and had a conversation with Du-Boise. All of this was captured on video without audio. There were a total of three cameras that picked up the altercation. .
“After a short conversation between Bohannon and DuBoise, DuBoise moved away from- Bohannon and pushed him slightly, while gesturing to him to leave. Harvey left the car over by the side of the Lounge and walked back toward Bo-hannon and DuBoise and there was some additional conversation. DuBoise and Harvey turned to leave and had walked several feet away when Bohan-non reached under his shirt to his back and produced a .357 Ruger revolver pistol. To fire the Ruger pistol the user must manually cock the hammer each time before pulling the trigger. After walking away several steps, both Du-Boise and Harvey turned suddenly to look at Bohannon. Apparently, the hammer had been cocked. Both men then began running and Bohannon began running after them. There were no shots fired at this time. Both men ran around the corner of the Lounge to an area that was fenced in by an 8 foot privacy fence. There was a cutout in the building and both men wedged into that cutout. DuBoise and Harvey produced guns. One of the deceased had a .32 automatic and the other a 2-shot .22 caliber derringer. Both of these guns were later found to have been fired and there was at least one misfire of the .22 derringer and one unfired cartridge from the .32 which had been ejected.
“A gunfight ensued with Bohannon firing and hitting the concrete block building and at or near the same time a *470 shot being fired toward Bohannon. Harvey ran from the hiding place and received a single gunshot wound to the upper left chest and there was skull trauma including what appeared to be a shoe print on Harvey’s face. DuBoise also ran from the hiding place and received multiple gunshot wounds. One bullet entered the anterior chest striking his liver; one bullet entered in the ribs striking the stomach and the kidney, the entry being from the posterior lower back close to the kidney and the spleen; and another entered on the left side which involved the lung and the heart. Forensics could not determine the sequence of bullets entering, but the video of DuBoise would indicate that the posterior back entry was first and that Bo-hannon was over DuBoise when the next two bullets entered. The police investigation team collected spent cartridges around the deceased and they were later confirmed to have been fired from a .357 Ruger which caused the deaths of Du-Boise and Harvey. Spent cartridges from the other two guns were recovered as well.
“Additional crime scene collections included two small bags of methamphetamine found on DuBoise inside a magnetic key holder such as could be placed in the tire well of a car. In addition to DuBoise having been shot 3 times, according to witnesses, Bohannon then pistol whipped DuBoise with the butt-end of the Ruger, which ultimately broke. DuBoise’s teeth were dislodged from his mouth and he suffered a skull fracture....
“After Bohannon had killed DuBoise and Harvey, Bohannon removed his own cowboy hat and put on a baseball cap belonging to one of the victims.”
(C.R. 71-74.)
Wade Brown, a friend and employee of Bohannon’s, testified that on the evening of December 10, 2010, he, Bohannon, and Bohannon’s wife, Donna, went out for the evening. They went to the lounge early in the evening and played pool and left and went to several other bars, drank alcohol, and played pool. In the early morning hours of December 11, 2010, the three returned to the lounge. Brown did not know what happened until after the first shots had been fired, and he did not see Bohannon have any altercation with either Harvey or DuBoise before the first shots were fired.
Robert Hoss, a regular at the lounge, testified that he was at the lounge when the shootings occurred. He said that the victims had been in the lounge playing pool before the shootings and that around 7:00 a.m. he heard a “big bang” and went to the door of the lounge to see what was happening. He testified that he saw DuBoise lying on the ground, that he telephoned emergency 911, that he saw Harvey running and saw Bohannon shoot Harvey, that Bohannon went to the victims and started beating one of them with his pistol and kicking him, and that Bohannon then searched DuBoise’s pockets and took money from his pockets. (R. 1180.) A transcript of Hoss’s 911 telephone call was introduced during his testimony and played to the jury. During the emergency call, Hoss screamed: “He’s just shooting people like they were nothing.”
Melissa Weaver testified that she had worked at the lounge off and on for 10 years, that she was a bartender, that Du-Boise and Harvey were regulars at the lounge, that they played pool, that on the morning of the shootings she started work at 12:00 a.m., that Bohannon and two others came in the lounge around 12:00 a.m. left and came back around 2:00 a.m. or 3:00 a.m., that when Bohannon came back *471 he asked her for “an ounce of meth,” that she told Bohannon that she could not get him any methamphetamine, that she did not observe any altercation between Bo-hannon and the victims, that after the first shots were fired she locked the door to the lounge, and that she and the other patrons watched what was happening on the video monitors. Weaver said that sometime before the shootings, Bohannon had called her over and said to her: “[I]f something happens in here tonight, I want you to know that it’s not your fault.” (R. 1198.)
Sharon Thompson testified that she had worked at the lounge for six years and was at the Lounge on the morning of the shootings but was not working. Thompson said that she came to the lounge with Harvey and DuBoise and that the three of them shot pool all night. When the shooting started she looked out the door and saw DuBoise on the ground. Someone pulled her back into the lounge. Thompson testified that, before the shootings, Weaver asked her to watch the bar while she went to the restroom. At that time, she said, Bohannon approached her and asked her if she could get him some “meth.” (R. 1213.) She told Bohannon no and walked off.
Officer Victor Myles of the Prichard Police Department testified that Bohannon made a spontaneous statement as another officer placed Bohannon in his patrol car after Bohannon had been read his Miranda[1] rights. Bohannon said: “It should be self-defense, because he owed me money” (R. 1290.)
Bohannon’s defense was that he acted in self-defense. He presented three witnesses who testified that he had a good reputation and that he did not use drugs.
The jury convicted Bohannon of capital murder. A sentencing hearing was held, and the jury recommended, by a vote of 11 to 1, that Bohannon be sentenced to death. The circuit court held a separate sentencing hearing pursuant to § 13A-5-47, Ala. Code 1975, and sentenced Bohannon to death. This appeal followed.
Standard of Review
Because Bohannon has been sentenced to death, this Court must review the circuit court proceedings for “plain error.” See Rule 45A, Ala. R.App. P. Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In discussing the scope of the plain-error rule, this Court has stated:
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, *472 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Hall v. State, 820 So.2d 113, 121-22 (Ala. Crim.App.1999). “ ‘The plain error exception to the contemporaneous objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).
With these principles in mind, we review the issues raised by Bohannon in his brief to this Court,
Guilt-Phase Issues
I.
Bohannon argues that the circuit court erred in allowing the prospective-jurors to be death-qualified because, he says, it created a conviction-prone jury.[2] Specifically, he argues that death-qualifying the jurors violated his constitutional rights to due process, equal protection, a fair trial, and a reliable sentencing determination. Bohan-non relies on a concurring opinion in the United State Supreme Court case of Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), and a dissenting opinion in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).
Bohannon did not object to the circuit court’s method of handling the voir dire examination concerning the juror’s views on the death penalty; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“A jury composed exclusively of jurors who have been death-qualified in accordance with the [Wainwright v.] Witt, [469 U.S. 412 (1985),] test is, considered to be impartial even though it may be more conviction prone than a non-death qualified jury. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Constitution does not prohibit the state from death qualifying jur ries in capital cases. Id.”
Haney v. State, 603 So.2d 368, 392 (Ala. Crim.App.1991). Other states that have considered this issue agree. See State v. Addison, 165 N.H. 381, 624, 87 A.3d 1, 201 (2013) (“Since [Lockhart v.] McCreef, 476 U.S. 162 (1986)] was decided, ‘no court that has considered the issue has found death qualification to violate, the federal, or respective state constitution,’ ... and the defendant has not cited any state or federal case that supports his argument.”); State v. Maestas, 299 P.3d 892, 986 (Utah 2012) (“[W]e reject [the appellant’s] federal and state constitutional challenges to the death qualification process.”); State v. Odenbaugh, 82 So.3d 215, 48-49 (La.2011) (‘•‘[T]his Court has repeatedly, rejected the claim that the Witherspoon [v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968),] qualification process results in a death-prone jury.”); State v. Fry, 138 N.M. 700, 709, 126 P.3d 516, 525 (2005) (“[W]e believe that the [Wainwright v.] Witt[, 469 U.S. 412 (1985),]/Witherspoon standard strikes the proper balance and assures a jury composed of individuals capable of applying the law to the facts and following the instructions of the court, without being predisposed in favor of either party.”); State v. Wright, 160 N.C.App. 251, 584 S.E.2d 109 (2003) (unpublished disposition) (“The North Carolina Supreme Court has consistently held that ‘ “death-qualifying” a jury is constitu *473 tional under both the federal and state Constitutions.’ ”); State v. Jones, 197 Ariz. 290, 302, 4 P.3d 345, 357 (2000)(“We have recognized that death-qualification is appropriate in Arizona, even though juries do not sentence.... ”).
The circuit court did not err in allowing the jurors to be death-qualified. Bohan-non is due no relief on this claim.
II.
Bohannon next argues that the circuit court erred in failing to remove five prospective jurors for cause because, he says, they were biased.
“To justify a challenge for cause, there must be a proper statutory ground or ‘“some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.” ’ Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This Court has held that ‘once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions’ about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror ‘need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.’ Kinder v. State, 515 So.2d 55, 61 (Ala.Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror ‘“must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused’”; ‘“[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.”’ Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App.1989)).”
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998).
“ ‘The qualification of prospective jurors rests within the sound discretion of the trial judge.’ Morrison v. State, 601 So.2d 165, 168 (Ala.Crim.App.1992); Ex parte Cochran, 500 So.2d 1179, 1183 (Ala.1985). This Court will not disturb the trial court’s decision ‘unless there is a clear showing of an abuse of discretion.’ Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala.1988). ‘This court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised.’ Knop [v. McCain], 561 So.2d [229] at 232 [(Ala.1989)]. We must consider the entire voir dire examination of the juror ‘in full context and as a whole.’ Ex parte Beam, 512 So.2d 723, 724 (Ala.1987); Ex parte Rutledge, 523 So.2d at 1120.”
Ex parte Burgess, 827 So.2d 193, 198 (Ala. 2000).
“Even though a prospective juror may initially admit to a potential for bias, the trial court’s denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law.”
*474 Ex parte Land, 678 So.2d 224, 240 (Ala.1996).
“A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1993). For that reason, we give great deference to a trial judge’s ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001).”
Turner v. State, 924 So.2d 737, 754 (Ala.Crim.App.2002).
We now review the five challenged prospective jurors who Bohannon challenges on appeal.
A.
First, Bohannon argues that prospective juror Z.S.[3] should have been removed for cause because of his connection to one of the victims and his views on the death penalty. Specifically he argues that Z.S. was a friend of DuBoise’s sister, Darla Stevens and that Stevens was also his fíancée’s boss. Additionally, Z.S. also wrote on his questionnaire: “I believe if someone kills someone, they deserve the [death] penalty.” (R. 492.)[4]
Bohannon moved that Z.S. be removed for cause. The circuit court denied that motion. However, Z.S. did not serve on Bohannon’s jury. Although Z.S. was originally on Bohannon’s jury, at the defense’s request and with the agreement of the State, the defense substituted its last strike to remove Z.S. (R. 1029.)
The record shows that prospective juror Z.S. stated during voir dire that his association with one of the victim’s sisters would not affect his ability to be impartial.' (R. 246.) Z.S. also stated that the fact that Stevens was his fíancée’s boss would not affect his ability to be impartial. Z.S. also stated: “I mean, I’m not just going to say death penalty right away. I mean I’m going to give it—I mean I’m going to be reasonable about it.” (R. 494.) Z.S. said that he would follow the law and not automatically vote for the death penalty. (R. 498.)
A juror is to be removed for cause if he or she has a “fixed opinion as to the guilt or innocence of the defendant which would bias his [or her] verdict.” Section 12-16-150(7), Ala.Code 1975.
“ ‘[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury.’ Brownlee v. State, 545 So.2d 151, 164 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989)....”
Morrison v. State, 601 So.2d 165, 168 (Ala. Cr.App.1992). See also Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001); Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.2000); Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1993).
Prospective juror Z.S. unequivocally stated, several times, that his connection with one of the victim’s families would have no affect on his ability to be impartial. • “Unless a prospective juror indicates that his relationship with the victim would prevent him from being fair and impartial, a challenge for cause should be denied.” Ray v. State, 809 So.2d 875, 885 (Ala.Crim.App.2001).
*475 Also, “[i]t is well settled that ‘ “jurors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.” Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App. 2000).’ ” Albarran v. State, 96 So.3d 131, 162 (Ala.Crim.App.2011). Z.S. explained his remarks about the death penalty and stated that he would not automatically vote for death. The circuit court committed no error in declining to remove Z.S. for cause.
Moreover, the Alabama Supreme Court in Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002), adopted the harmless-error analysis in a challenge based on the failure to remove a juror for cause:
“The application of a ‘harmless-error’ analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
‘“The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.’
“Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that ‘[t]he denial or impairment of the right is reversible error without a showing of prejudice.’ (Emphasis added.) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala.1989); Ex parte Rutledge, 523 So.2d 1118 (Ala. 1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State, 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting Uptain).
“... [T]his Court has returned to the ‘harmless-error’ analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an ‘impartial’ jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
“In this instance, even if the Betheas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.”
833 So.2d at 6-7. Cf. General Motors Corp. v. Jernigan, 883 So.2d 646 (Ala.2003) (revisiting Bethea and holding that erroneous failure to remove five prospective jurors for cause constituted reversible error).
*476 As stated above, Z.S. did not serve on Bohannon’s jury; therefore, any error that did occur was harmless. See Bethea. Bohannon is due no relief on this claim.
B.
Next, Bohannon argues that the circuit court erred in failing to sua sponte remove prospective juror J.L. for cause because, he says, J.L. could not be impartial. Specifically, he argues that J.L.’s son had clerked for the Mobile.County District Attorney’s office and his son’s supervisor was one of the two attorneys prosecuting Bohannon’s case.
Bohannon did not move that J.L. be removed for cause. Therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. J.L. did not serve on Bo-hannon’s jury; Bohannon used his ninth peremptory strike to remove J.L.
J.L. stated that the fact that his somhad interned for the district attorney’s office would not affect his ability to be impartial. Later during voir dire, the following occurred:
“[Prosecutor]: I think you had mentioned Mr. Simpson was your son’s su-, pervisor; is that right?
“[J.L.]: Right.
“[Prosecutor]: Anything about the stories that he would come home from or—
“[J.L.]: No. I mean he would tell me they had a good working relationship and he had a lot of—he had a lot of respect for [Simpson] and he would always speak highly of him, so.
“[Prosecutor]: Anything about that that you wouldn’t be able to put aside those comments from your son and be fair in this case to both the State and defense because of that?
“[J.L.]: The Judge asked me that earlier. And, at the time, I said, no, it would be fine. Subconsciously, I don’t know if it would alter some of the way in which I looked at motions that were being made and rulings that the Judge would make. I’m just not sure.
“[Prosecutor]; But you know that if you were selected to serve as a juror in this casé, you would have to base your verdict solely on the law and the evidence, right? ■
“[J.L.]: Uh-huh, right.
“[Prosecutor]; And would you feel like, oh, I—■
“[J.L.]: I would not be swayed simply because you were or [Simpson] was trying the case.”
(R. 601-02.) As stated above, no motion to remove J.L. was made after the above discussion.,
“[The appellant] seems'to .imply that [a juror] should have been removed for cause because one of his cousins was an assistant district attorney. The record does not establish .that the cousin to whom [the juror] referred was involved in prosecuting [the appellant]. -Therefore, circuit court did not commit error, plain or otherwise, in leaving [the juror] on the venire.”
Wimbley v. State, 191 So.3d 176, 221 (Ala.Crim.App.2014). See also Commonwealth v. Stamm, 286 Pa.Super. 409, 416, 429 A.2d 4, 7 (1981) (“[0]ur Supreme Court has held that relatives of county detectives, even if the officer is the active prosecutor in the case, are not to be disqualified on that basis alone.”). ' '
Here, the record does not reflect that J.L.’s son had any connection to Bohan-non’s case. The, circuit court, did not err in failing to sua sponte remove juror J.L. for cause. ..See Morrison v. State, supra. Bohannon is due no relief on this claim.
*477 C.
Bohannon next argues that the circuit court erred in failing to sua sponte remove prospective juror J.B. for cause because, he says, J.B. was biased in favor of the death penalty.
Because Bohannon did not move that prospective juror J.B, be struck for cause we review this claini for plain error. See Rule 45A, Ala. R.App. P. J.B. did not sit on Bohannon’s jury; Bohannon used his second peremptory strike to remove J.B.
‘“[A] proper challenge for cause exists only when a prospective juror’s opinion or bias is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence.’ Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala.1988). ‘[A] trial court’s ruling on.a challenge for cause based on bias is 'entitled to great weight and will not be disturbed on appeal unless there is a clear showing of an abuse of discretion by the trial court.’ Rutledge, 523 So.2d at 1120.”
Parker v. State, 587 So.2d 1072, 1082 (Ala.Crim.App.1991).
The record shows that J.B. stated on his questionnaire: “I believe [the death penalty] is needed. I don’t want murderers to be alive.” When questioned during voir dire J.B. said: “If you get away with murder, then there’s something wrong.” However, J.B. indicated after several minutes of questioning that he would not automatically vote for the death penalty but would follow the law and weigh the circumstances as instructed by the court. (R. 372.)
The circuit court did not err in failing to sua sponte remove J.B. Bohannon is due no relief on this claim.
D.
Bohannon argues that the circuit court erred in failing to sua sponte remove prospective juror A.N. for cause because, he says, A.N. was a retired sheriffs deputy, and had a. connection to the district attorney’s office and to State witnesses.
Neither side moved to remove A.N. for cause; therefore, we review this claim for plain error. See Rule 45A, Ala. R,App. P. Bohannon used his third peremptory strike to remove this juror.
“There is no statutory ground for eliminating a police officer from a jury. The courts in this state have long held that a prospective juror may not be struck for cause based solely on the fact he is a deputy .sheriff or involved in law enforcement.” Humphrey v. State, 591 So.2d 583, 585 (Ala.Crim.App.1991). See Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1993). Other states agree. See State v. Hernandez, 82 So.3d 327, 334 (La.Ct.App.2011) (“[T]he Louisiana Supreme Court has held that a person is not automatically disqualified to serve as a juror simply because of his status as a police officer.”); Commonwealth v. Moreno, 64 Mass.App.Ct. 1107, 833 N.E.2d 693 (2005) (unpublished opinion) (“A challenge for cause based solely on the prospective juror’s profession as a police officer would have failed.”); State v. Cho, 108 Wash.App. 315, 324, 30 P.3d 496, 501 (2001) (“[T]here is nothing inherent in the experience or status of being a police officer that would support a finding of bias [for a challenge for cause].”); Sholler v. Commonwealth, 969 S.W.2d 706, 708 (Ky.1998) (“We have held that police officers are not disqualified to serve as jurors in criminal cases.”).
- Prospective juror A.N. indicated that he could be impartial and that his prior occupation would not affect his ability to be impartial in Bohannon’s case. The circuit court committed no error in failing to sua sponte remove prospective juror A.N. for cause. Bohannon is due no relief on this claim.
*478 E.
Bohannon next argues that the circuit court erred in failing to remove prospective juror L.M. for cause because, he says, L.M. had known the prosecutor’s mother and father for 30 years and at one time had been good friends with the prosecutor’s parents.' (R. 252.)
Before voir dire began the prosecutor moved that prospective juror L.M. be removed for cause because of his relationship with the prosecutor. The circuit court denied that motion. (R. 921.) L.M. did not serve on Bohannon’s jury. Bohannon used his fifth peremptory strike to remove L.M.
The record shows that prospective juror L.M. stated that his friendship with the prosecutor’s parents had been about 30 years ago and that he had only seem them once or twice in the last 15 years. (R. 921.) He stated that his friendship would have no affect on his ability to be impartial in the ease.
“[The juror’s] testimony revealed that he had been friends with one of the prosecutors for a long time. Nevertheless, the mere fact of acquaintance is not sufficient to disqualify a prospective juror if the panel member asserts that the acquaintance will not affect his judgment in the case.”
Carrasquillo v. State, 742 S.W.2d 104, 111 (Tex.App.1987). See also J.H.B., Relationship to Prosecutor or Witness for Prosecution as Disqualifying Juror in Criminal Case, 18 A.L.R. 375 (1922).
The circuit court did not err in failing to sua sponte remove prospective juror L.M. for cause. Bohannon is due no relief on this claim.
III.
Bohannon next argues that the circuit court erred in erroneously removing prospective jurors for cause based on their views on the death penalty because, he argues, they indicated that they could be fan- and impartial. Specifically, he challenges the removal of three prospective jurors: M.R., A.M., and S.P.
“In Taylor v. State, 666 So.2d 36, 47 (Ala.Cr.App.1994), this Court outlined the guidelines for determining whether a potential juror should be excluded for cause based on his or her feelings concerning capital punishment:
“ ‘ “The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is ‘whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.”’ Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). ‘The crucial inquiry is whether the venireman could follow the court’s instructions and obey his oath, notwithstanding his views on capital punishment.’ Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror’s bias need not be proved with ‘unmistakable clarity’ because ‘juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.’ M” ’ ”
Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997).
“[T]here are occasions where a juror’s claim of freedom from prejudice and impartiality cannot be accepted and should not be believed. See Patton v. Yount, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984).
*479 ‘[T]he simple extraction of an affirmative response from a potential juror does not necessarily absolve that juror of probable prejudice.’ [Wood v.] Woodham, 561 So.2d [224] at 228 [ (Ala.1989) ].”
Parker v. State, 587 So.2d at 1083.
With these legal principles in mind we review the three challenged jurors who Bohannon argues were erroneously removed for cause.
A.
Prospective juror M.R. indicated on his juror questionnaire that he could never return a verdict recommending a death sentence. During voir dire, he said that voting for death would be a problem and that nothing the prosecutor could say or do would make him vote for the death penalty.
The record shows that the voir dire of prospective juror M.R. consisted of 16 pages and that M.R. repeatedly said that he would have problems imposing a death sentence. Although M.R. did say at one point that he could follow the law, it was clear that he had strong feelings against the death penalty. At the conclusion of the voir dire of M.R., the State moved that M.R. be removed for cause based on his views against capital punishment. The prosecutor stated:
“Judge, challenge for cause on [M.R.]. Not only is his questionnaire consistent, but before I even finished explaining what the process is, he started making faces and cringing and saying I can’t do that, I can’t do that.”
(R. 997.) The circuit court then observed:
“Well, the Court observed [M.R.] and the difficult time he had getting through these questions, more so than most of our jurors have. While he seemed like he wanted to try to please everybody, he couldn’t answer my questions that he ■could really consider a situation where the death penalty might be imposed. It seemed like it was just too hard for him to get there.
[[Image here]]
“The Court is under the definite impression that this juror would have such a difficult time to faithfully and impartially apply the law that he would not be competent to sit on this jury, and the Court will grant the State’s challenge for cause.”
(R. 998-99.)
Section 12-16-152, Ala.Code 1975, specifically provides:
“On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence.”
As this Court stated in Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013):
“ ‘ “In a capital case, a prospective juror may not be excluded for cause unless the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.” Drew v. Collins, 964 F.2d 411, 416 (5th Cir.1992), cert. denied, 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993) (quotations omitted). “[T]his standard likewise does not require that a juror’s bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of *480 a catechism.” [Wainwright v.] Witt, 469 U.S. [412] at 425-26, 105 S.Ct. [844] at 852-53 [ (1985) ].’ ”
154 So.3d at 196-97, quoting Parr v. Thaler, 481 Fed.App’x 872, 876 (5th Cir.2012).
■ Our review of the record clearly supports the circuit court’s decision to grant the State’s motion to remove prospective juror M.R. for cause based on his views against the death penalty. Bohannon is due no relief on this claim.
B.
Bohannon next- argues that the circuit court erred in granting the State’s motion to remove prospective juror A.M. for cause based on his views on the death penalty.
A.M. wrote on his. questionnaire that he did not think he could vote for the death penalty. The individual voir dire of A.M. consisted of 20 pages, and at its conclusion the State moved that A.M. be struck for cause. The circuit court stated:
“Well, I think my responsibility is, if I come off with a definite impression that he is going to • have trouble following faithfully and impartially applying the law, then I have a problem with it. And I believe—a very sincere gentleman— but I believe that he would have a substantial problem faithfully and impartially applying the law that I would give, based upon my observation's of him and how he responded.
“I understand what he said. But I also understand what he wrote. And I understand how he went through this very difficult questioning period. But I’m going to grant the challenge for cause by the State.”
(R. 642-43.)
Our review of the voir dire examination of prospective juror A.M. supports the circuit court’s removal of A.M. based on his views in opposition to the death penalty. Bohannon is due no relief -on this claim.
C.
Bohannon next argues that the circuit court erred in granting the State’s challenge for cause of prospective juror S.P. During voir dire, S.P. stated: “I’m not in favor of the death penalty. I think that a person should be punished for their wrong doing instead of dying, you know, for it.” (R. 968.) She did indicate that she would do what the judge told her to do but, after that, she indicated that she did not know that if there was a situation where the State could convince her to vote for the death penalty. (R. 976.)
Again, the record clearly supports the circuit.court’s removal of prospective juror S.P. for cause based on her views against capital punishment. See Boyle v. State, supra. Bohannon is due no relief on this claim.
IV.
Bohannon next argues that the State violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using five of its peremptory strikes to remove black prospective jurors solely on the basis of their race. In Bat-son, the United States Supreme Court held that it was a violation of the Equal Protection Clause to strike a black prospective juror from a black defendánt’s jury based solely on the juror’s race.
Neither party made a Batson objection after the jury was struck; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“ ‘To find plain error in the context of a Batson .,., violation, the record must supply an inference that the prosecutor was “engaged in the practice of purposeful discrimination.” ’ Blackmon v. State, *481 7 So.3d 397, 425 (Ala.Crim.App.2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987)). See also Saunders v. State, 10 So.3d 53, 78 (Ala.Crim. App.2007) (‘For an appellate court to find plain error in the Batson [or J.E.B.] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges.’).”
Kelley v. State, [Ms. CR-10-0642, September 5, 2014] — So.3d -, - (Ala.Crim.App.2014).
“ ‘A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state’s attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state’s questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.’ ”
Gobble v. State, 104 So.3d 920, 948 (Ala.Crim.App.2010), quoting Ex Parte Trawick, 698 So.2d 162, 167-68 (Ala.1997).
After prospective jurors were removed for cause, the venire consisted of 32 white jurors, 9 black jurors, and 1 juror who indicated “other” for race. The prosecutor had 15 peremptory strikes and used 5 of those strikes to remove black prospective jurors. The defense struck two black prospective jurors and two served on the jury. ‘“[S]tatistics and opinion alone do not prove a prima facie ease of discrimination.’ Banks v. State, 919 So.2d 1223, 1230 (Ala.Crim.App.2005) (citing Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001)). See also Stanley v. State, 143 So.3d 230, 254 (Ala.Crim.App.2011) (‘this Court has held that numbers or percentages alone will not substantiate a ease of discrimination in this context’).” Scheuing v. State, 161 So.3d 245, 260 (Ala.Crim.App.2013).
In the present case, as in McMillan v. State, 139 So.3d 184, 202-03 (Ala.Crim.App.2010), “[although the African-American potential jurors struck by the State may appear to be homogeneous on first blush, the information provided by them during voir dire examination is pertinent here, as well as in evaluating whether they were treated differently from potential white jurors. Moreover, their answers establish that there were race-neutral reasons for striking these potential jurors.” The record indicates the following eireum- *482 stances concerning the potential jurors who were struck by the prosecutor.
C.C.—C.C. stated that she had a son who had been in prison for three years and she visited him frequently. She also wrote on her questionnaire that she could not vote for the death penalty because it would be on her conscience. She further stated during voir dire that she had a prior charge for assault or harassing communications. (R. 878-88.) C.J.—C.J. stated that she had a stepson who had been convicted of theft and stated that she was not in favor of the death penalty. (R. 894-903.)
J.R.—J.R. stated that her brother had been convicted of murder and she had visited him frequently before he died in prison. Also, J.R. stated that she had mixed feelings about the death penalty. (R. 670-83.)
M.P.—M.P. stated that he had a “lot of religious beliefs” but was vague about his views on capital punishment. M.P. also stated that he had reservations about serving as a juror because of his medical condition and the extensive medication that he was required to take. (R. 460-68.)
E.D.—E.D. stated that he had a criminal history and admitted during voir dire that he did not write all of his prior charges on his juror questionnaire. (R. 767-69.)
The above reasons, which are readily discernible from the record, were all race-neutral reasons. “The fact that a family member of the prospective juror has been prosecuted for a crime is a valid race-neutral reason.” Yelder v. State, 596 So.2d 696, 698 (Ala.Crim.App.1991). “[A] veniremember’s connection with or involvement in criminal activity may serve as a race-neutral reason for striking that veniremember.” Wilsher v. State, 611 So.2d 1175, 1183 (Ala.Crim.App.1992). “‘That a veniremember has reservations about the death penalty, though not sufficient for a challenge for cause, may constitute a race-neutral and reasonable explanation for the exercise of a peremptory strike.’” Fisher v. State, 587 So.2d 1027, 1036 (Ala.Crim.App.1991).
Moreover, the record includes extensive questioning of the venire and indicates no lack of meaningful questioning. Bohannon was not limited in his questioning of potential jurors. “The record indicates that the entire panel was questioned at length by both parties and that neither party was deprived from asking any potential juror any submitted question.” Brown v. State, 982 So.2d 565, 586 (Ala.Crim.App.2006).
“ ‘While disparate treatment is strong evidence of discriminatory intent, it is not necessarily dispositive of discriminatory treatment. Lynch [v. State], 877 So.2d [1254] at 1274 [ (Miss.2004) ] (citing Berry v. State, 802 So.2d 1033, 1039 (Miss.2001)); see also Chamberlin v. State, 55 So.3d 1046, 1050-51 (Miss.2011). “Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual.” Lynch, 877 So.2d at 1274 (quoting Berry [v. State], 802 So.2d [1033] at 1040 [ (Miss.2001) ]).’
“Hughes v. State, 90 So.3d 613, 626 (Miss.2012).
“ ‘ “As recently noted by the Court of Criminal Appeals, ‘disparate treatment’ cannot automatically be imputed in every situation where one of the State’s bases for striking a venireperson would technically ap *483 ply to another venireperson whom the State found acceptable. Cantu v. State, 842 S.W.2d 667, 689 (Tex.Crim.App.1992). The State’s use of its peremptory challenges is not subject to rigid quantification. Id. Potential jurors may possess the same objectionable characteristics, yet in varying degrees. Id. The fact that jurors remaining on the panel possess one of more of the same characteristics as a juror that was stricken, does not establish disparate treatment.”
“ ‘Barnes v. State, 855 S.W.2d 173, 174 (Tex.App.1993).
“ ‘ “[W]e must also look to the entire record to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the venire-members that would, under the facts of this case, justify' the prosecutor treating them differently as potential members of the jury. See Miller-El [v. Dretke], 545 U.S. [231] at 247, 125 S.Ct. [2317] at 2329 [162 L.Ed.2d 196 (2005) ].”
‘“Leadon v. State, 332 S.W.3d 600, 612 (Tex.App.2010).
“ ‘ “Potential jurors may possess the same objectionable characteristics, but in varying degrees. Additionally, prospective jurors may share a negative feature, but that feature may be outweighed by characteristics that are favorable from the State’s perspective. Such distinctions may not another.”
‘“Johnson v. State, 959 S.W.2d 284, 292 (Tex.App.1997). “This Court has recognized that for disparate treatment to exist, the persons being compared must be ‘otherwise similarly situated.’” Sharp v. State, 151 So.3d 308, 342 (Ala.Crim.App.2013) (on rehearing).
“ ‘ “The prosecutor’s failure to strike similarly situated jurors is not pretextual ... “where there are relevant differences between the struck jurors and the comparator jurors.’ United States v. Novaton, 271 F.3d 968, 1004 (11th Cir.2001). The prosecutor’s explanation ‘does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.’ Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 973-74, 163 L.Ed.2d 824 (2006) (quotation marks and citation omitted).”
“ ‘Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir.2009).’
“Wiggins v. State, 193 So.3d 765, 789-90 (Ala.Crim.App.2014).”
Luong v. State, 199 So.3d 173, 192-93 (Ala.Crim.App.2015).
Although Bohannon contends that there is a long history of racial discrimination by the Mobile County District Attorney’s Office in striking juries, the most recent case cited by Bohannon in his brief in making this claim is a 1999 case.[5] Despite Bohan-non’s contention that the district attorney’s office has a long history of striking jurors based on race, “this was not reflected in, or indicated by, the record. See Sharifi v. State, 993 So.2d 907, 928 (Ala.Crim.App.2008) (no inference from the record of *484 discriminatory use of peremptory challenges by the prosecutor despite ¡Sharifi’s argument that Madison County has a long history of violating Batson and that the number of strikes used by the State indicated prejudice).” Dotch v. State, 67 So.3d 936, 982 (Ala.Crim.App.2010). See also McMillan v. State, 139 So.3d at 205.
Therefore, the record fails to raise an inference of purposeful discrimination in the. selection of Bohannon’s jury. . Accordingly, we find no plain error in regard to Bohannon’s Batson claim, and Bohannon is due no relief. See Kelley v. State, supra.
V.
Bohannon next argues that the circuit court deprived him of his constitutional right to thoroughly cross-examine a State’s witness, Melissa Weaver, regarding her pending criminal charges.
The record shows that Weaver testified that she was working on the day of the murders and that at around 2:00 a.m. that morning Bohannon asked her if he could buy an ounce of “meth.” (R. 1193.) When she replied that she could not get any methamphetamine, Bohannon asked ■ her where he could get some. At another point that morning, Weaver testified..that “[Bohannon] called me from around, my side of the bar to where he was.sitting and he said, if something happens in here tonight, I want you to know that it’s not your fault.” (R. 1198.) After direct examination and before Bohannon cross-examined Weaver, the following occurred:
“[Defense cmmsel]: Judge, this lady had three distribution cases. Arrested in 2012. She got into drug court.
“Now, drug court has a policy from the very beginning, agreed to by the District Attorney—the former one and the one now—they don’t let anybody in drug court for distribution or manufacturing.
“She got in drug court in 2012. A year after this. And my inference is they let her in drug court—well, it can be argued they let her into drug court in order to-testify on behalf of the State.
“[Prosecutor]: I have caselaw on that. That is not a permissible form of cross-examination. There’s been absolutely— first of all, I will say there was no agreement with her Whatsoever. And to suggest one, when she is not a—it’s not a situation—she is not in a situation such ás testifying against a codefendant where there will be an exchange. Statements she made in this case were prior to 2012. And that case is still in drug court, to my understanding, and it’s not a conviction. It is a deferred prosecution. And it’s completely irrelevant to her testimony today.
“The Court: Couldn’t it show bias?
“[Prosecutor]: And there is caselaw, if the Court will permit me, in the very last case that I tried. .Only if there is some showing that—of ¡the connection. And T would offer that.
“And because there is no—and if the Court permits me to provide the case-law. But I was excluded in the last case I tried. - It’s been excluded in other cases. And to do it, is-to suggest something that is absolutely not true. And there is no proof of that. And I challenge anybody to—and had I done anything like that,-1 would certainly have to give that over to them, especially a capital murder case.
“[Defense counsel]: I didn’t say you did.
“[Prosecutor]: It’s a suggestion to be argued to the jury. And I have no way to refute that other-than to stand up to say it would'be unethicalof me to do that and not turn it over.
*485 “The Court: Let’s forget about the particulars. But if the defense has a right to cross-examine as to bias or prejudice, or regardless of what she’s doing, I’m just talking about her—because the question’s come up. She brought out that he had asked for drugs and asked her.
“[Defense counsel]: Right.
“The Court: And the best I can tell from her answer, she didn’t say—she just said, I didn’t know him.
“[Prosecutor]: Correct.
“[Defense counsel]: There was three instances of and she pled guilty but was not sentenced. So that prevents it from being a conviction. But she had three distribution cases in 2012. I don’t know whether she was arrested there. And I think all three of them are inside, the Paradise [Lounge].
“The Court: Before or after this?
“[Defense counsel]: 2012.
“[Prosecutor]: After.
“The Court: This was after?
[[Image here]]
“The Court: You can cross-examine her up to that point, but I’m not going to allow you to go into what happened, that she now has potential criminal problems after this is not connected with this. I mean if it had happened before and you can show that she was—.”
(R. 1199-1203.)
Section 12-21-137, Ala.Code 1975, provides, in part: “The right of cross-examination, thorough, and sifting, belongs to every party as ■ to the witnesses called against him.” Rule 611(b), Ala. R. Evid., provides: “The right to cross-examine a witness extends to any matter relevant to any issue and to matters affecting the credibility of the witness....”
As this Court stated in Grimsley v. State, 632 So.2d 547 (Ala.Crim.App.1993):
“ ‘Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’, perceptions and memory, but the. cross-examiner has traditionally been allowed to impeach, i,e., discredit, the witness. One way of discrediting the .witness is to introduce evidence of a prior criminal conviction of that witness. By so doing, the cross-examiner intends to afford the jury a basis to infer that the witness’ character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness’ credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is “always relevant as discrediting the witness and affecting the weight in his testimony,” 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev.1970). We have recognized that the exposure of a witness’ motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).
*486 “ Tn the instant case, defense counsel sought to show the existence of possible bias and prejudice of Green, causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identification of petitioner.
“ ‘We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green’s testimony which provided “a crucial link in the proof ... of petitioner’s act.” Douglas v. Alabama, 380 U.S. [415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965) ]. The accuracy and truthfulness of Green’s testimony were key elements in the State’s case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green’s vulnerable status as a probationer, ... as well as of Green’s possible concern that he might be a suspect in the investigation.’
“Davis v. Alaska, 415 U.S. 308, 316-18, 94 S.Ct. 1105, 1110-11, 39 L.Ed.2d 347 (1974) (emphasis added) (footnotes omitted).
“Here, the ‘probation’ evidence was offered to show the witness’s possible bias, and it ‘raised the possibility that it gave [the witness] an incentive to cooperate with the prosecutor.’ Commonwealth v. Cox, 837 S.W.2d 898, 901 (Ky.1992).
‘“[W]henever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury.... [T]he witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.’
“Commonwealth v. Ocasio, 394 Pa.Super. 100, 574 A.2d 1165, 1167 (1990), quoting Commonwealth v. Evans, 511 Pa. 214, 512 A.2d 626, 631-32 (1986). See also State v. Bennett, 550 So.2d 201, 204-05 (La.App.1989) (‘[w]e have no doubt in this case that the maximum sentence the witness could have received and the revocation of probation were particular facts which tended to show the bias or interest of this witness’), cert. denied, 554 So.2d 1236 (La.1990).”
632 So.2d at 552-53.
The circuit court erred in not allowing defense counsel to cross-examine Weaver about any pending charges against her—irrespective of when those charges occurred or whether she had been convicted of those charges. However, our analysis does not end there. “Violations of the confrontation clause of the Sixth Amendment are subject to harmless error analysis.” Huff v. State, 639 So.2d 539, 542 (Ala.Crim.App.1993). See also Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). As the United States Supreme Court stated:
“ ‘[W]e hold that the constitutionally improper denial of a defendant’s opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824 (1967) ], harmless-error analysis. The correct inquiry is whether, assuming that the damaging *487 potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. Those factors include the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.”
475 U.S. at 684.
As this Court has recognized:
“There are numerous factors which can be considered in assessing harmless error, including ‘the importance of the [declarant’s] testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, ... and the overall strength of the prosecution’s case.’ Delaware v. Van Arsdall, 475 U.S. [673] at 684, 106 S.Ct. 1431 [ (1986) ].”
James v. State, 723 So.2d 776, 782 (Ala.Crim.App.1998). “[T]he focus of the prejudice inquiry in determining whether the confrontation right has been -violated must be on the particular witness, not on the outcome of the entire trial.” Delaware v. Van Arsdall, 475 U.S. at 680.
Here, another witness, Sharon Thompson, testified that Bohannon asked in the hours before the shootings if he could buy drugs from her. That aspect of Weaver’s testimony was cumulative to Thompson’s testimony. Only Weaver testified that Bo-hannon made the following statement: “[I]f something happens in here tonight, I want you to know that it’s not your fault.” However, this statement did not directly implicate Bohannon in the murders. Indeed, the shootings were captured on three video cameras and played to the jury. These videos clearly show Bohan-non’s culpability in the shootings. Defense counsel also vigorously cross-examined Weaver. Weaver admitted that she had used and sold methamphetamines and that she had used those drugs with the two victims on multiple occasions. One main aspect of Weaver’s testimony was corroborated by another State witness. Last, the State’s evidence against Bohannon was overwhelming. Based on the record in this case, we hold that the circuit court’s ruling prohibiting Bohannon from cross-examining Weaver concerning any pending charges was harmless beyond a reasonable doubt. See James, supra. Bohannon is due no relief on this claim.
VI.
Bohannon next argues that the circuit court erred in admitting testimony regarding his post-Miranda assertion of his right to remain silent in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
Here, the following occurred during Officer Victor Myles’s testimony:
“[Prosecutor]: And at any point did you attempt to question [Bohannon]?
“[Officer Myles]: Yes, I did. When I arrived back to the station after leaving the scene, Mr. Bohannon was already at our station. And I approached him and I advised him of his Miranda rights. And I questioned—I was in the process of questioning him, at which time he told me he did not want to give me a statement.
[[Image here]]
*488 “[Prosecutor]: Okay. And I think you already alluded to the fact that, after you advised him of his rights, did you ask him if he wished to make a statement?
“[Officer Myles]: I did, and he answered no.
“[Prosecutor]: At that point in time, did you attempt to ask him any’ questions?
“[Officer Myles]: No, I did not.
“[Prosecutor]: All right. Now, what were you doing after he refused to make a statement as far as where he went next and that kind of thing?
“[Officer Myles]: After he refused to make a statement, I go ahead and I go ahead, you know, had the other officer place handcuffs on him. At which time, I explained to him that he was being charged with two counts of murder and that he would be transported to Mobile Metro jail.”
(R. 1286-90.) Officer Myles then testified that, as another officer was placing Bohan-non in the patrol car, Bohannon said:
“[H]e owed me money. It should be self-defense, because he owed me money.” (R. 1290.)
The record shows that the following discussion occurred before Officer Myles testified:
“[Prosecutor]: Judge, the next witness is going to be Victor Myles. And he’s going to testify as to the arrest of the defendant and a spontaneous statement that was made by the defendant. The spontaneous statement was made after [Bohannon] had been advised of his Miranda rights and invoked his rights.
“And; typically, I would riot comment on that or would not ask that, except for, in this case, there was a spontaneous statement that followed it. So I think it’s relevant for the purposes of volun-tariness of the subsequent spontaneous statement. I don’t plan to. argue that or anything of that nature. ■ But, typically, I wouldn’t even ask the question. But the spontaneous statement followed the ■invocation. So I will be happy to proceed as the Court desires. I can just ask about a spontaneous statement or I can go through , the Miranda predicate and then ask about it, so.
“[Defense counsel]: Judge, I really don’t care one way or the other. What I do care about, you know, there’s" no use in fighting a losing battle. I just—however she wants to handle it. As far as we’re concerned, if she wants to put him up there and say did he tell you—did he say this to you, that’s fine with me.
“The Court: Lay your predicate that you did Miranda and the rules, and after that, there was a spontaneous statement.”
(R. 1276-77.)
Bohannon did not object to Officer Myles’s testimony and, in fact, said that he did not care what method was used to provide the predicate for the admission of Bohannon’s spontaneous statement. Thus, Bohannon invited any error in the prosecutor questioning Officer Myles about his post-arrest silence. “The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error.” See Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003).
It is true that
“[t]he receipt into evidence of testimony concerning an accused’s post-Miranda exercise of the constitutional right to remain silent is itself a violation of the accused’s constitutional right to remain silent. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); Houston v. State, 354 So.2d 825 (Ala.Cr.App.1977), *489 cert. denied, 354 So.2d 829 (Ala.1978).”
Harris v. State, 611 So.2d 1159, 1160-61 (Ala.Crim.App.1992).
Bohannon did not remain totally silent but, instead, made a spontaneous statement. Some courts have found under similar circumstances that Doyle did not apply: United States v. Garcia, 496 Fed.App’x 749, 750 (2012) (not selected for publication in the Federal Reporter) (“Garcia’s spontaneous and volunteered post-arrest statements were admissible because he did not remain silent after being arrested.”); State v. Alas, 622 So.2d 836, 837 (La.Ct.App.1993) (“The defendant did make a spontaneous statement. Since [the appellant] made a statement after being read his Miranda warning Doyle does not apply.”); United States v. Turner, 551 F.2d 780 (8th Cir.1977) (holding that Doyle did not apply because defendant did respond that he had no knowledge of the incident). See also John W. Auchincloss, II, Protecting Doyle Rights After Anderson v. Charles: The Problem of Partial Silence, 69 Va. L.Rev. 155 (1983). Thus, we question whether Doyle applies, given the facts presented in this case.
Regardless of the application of Doyle to the facts in this case, the United States Supreme Court in Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), held that a Doyle violation is subject to a harmless-error analysis under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This Court has applied the harmless-error analysis to a Doyle violation in the following death-penalty cases: Kelley v. State, [Ms. CR-10-0642, September 5, 2014] — So.3d - (Ala.Crim.App.2014); Shaw v. State, 207 So.3d 79 (Ala.Crim.App.2014); Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999); Arthur v. State, 575 So.2d 1165 (Ala.Crim.App.1990).
“The determination of whether a Doyle violation is harmless should be made on a case-by-case basis under the specific facts of each case.” Qualls v. State, 927 So.2d 852, 856 (Ala.Crim.App.2005). See also Kelley v. State, [Ms. CR-10-0642, September 5, 2014] — So.3d - (Ala.Crim.App.2014); Shaw v. State, 207 So.3d 79 (Ala.Crim.App.2014).
Based on the evidence in this case, we can unequivocally say that if any Doyle violation did occur, the error was harmless beyond a reasonable doubt. Bohannon is due no relief on this claim.
VII.
Bohannon next argues that the circuit court erred in allowing the admission of evidence that he tried to purchase methamphetamine in the hours before the shootings. Specifically, he argues that this evidence was irrelevant to the crimes for which he was charged, that it constituted improper prior-bad-act evidence, that the State failed to give him notice pursuant to Rule 404(b), Ala. R. Evid., of its intent to introduce the evidence, and that no limiting instruction was given to the jury on the use of that evidence. The record shows that two state witnesses, Melissa Weaver and Sharon Thompson, testified that Bo-hannon asked them several hours before the shootings, if they would sell him drugs. Bohannon made no objection to the introduction of this evidence either when Weaver testified or when Thompson testified; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Rule 404(b), Ala. R. Evid, provides:
“Evidence of other crimes, wrongs, or acts is'not admissible to prove the character of a person in order to show action *490 in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
The Alabama Supreme Court in Ex parte Jackson, 33 So.3d 1279 (Ala.2009), stated:
“ ‘The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scien-ter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Crim.App.1984); Scott v. State, 353 So.2d 36 (Ala.Crim.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. “ ‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’” Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985), quoting United States v. Turquitt, [557 F.2d 464] at 468-69 [ (5th Cir.1977) ].’ ”
33 So.3d at 1285.
In regard to the res gestae exception, this Court has stated:
“As Professor Charles Gamble explained:
“‘Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term “res gestae” because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the “complete story” of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“‘Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute “other crimes, wrongs, or acts” as is generally excluded under Rule 404(b). Other courts hold that *491 Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule—i.e., that such acts are merely offered, rather than to prove bad character and conformity therewith,'to show all the circumstances surrounding the charged crime.’
“C. Gamble, McElroy’s Alabama Evidence § 69.01(3)(5th ed.1996) (footnotes omitted).
‘“[One such] “special circumstance” where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the “res ges-tae” exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible “to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” ’
“Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s .criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (‘Evidence of prior bad acts is admissible to “[t]ell the complete story so as not to confuse the jury,” ’); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (‘The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali’s testimony provided the jury with a “complete story” of Appellant’s criminal spree from the Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.’); - St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky.2004) (‘Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a “crime spree” that began with Appellant’s escape from an O’klahoma jail and ended with his flight from Tr.ooper Bennett.’); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) (‘ “Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (“‘The ‘complete story exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.”’); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (‘It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.’); State v. Schoen, 34 Or.App. 105, 109, 578 P.2d 420, 422 (1978) (‘The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to “sanitize” its evidence by deleting background information to the point that the evidence *492 actually presented seems improbable or , incredible.’)-”
Doster v. State, 72 So.3d 50, 87-89 (Ala.Crim.App.2010).
Here, evidence that Bohannon asked Weaver and Thompson to sell him methamphetamine was part of the res gestae of the double homicide. Both waitresses testified that they told Bohannon they could not sell him drugs. Minutes before the shootings one of the victims walked to a car and reached inside one of the tire wells. At the time of his death, DuBoise was in possession of a magnetic key holder that contained “two very small zip bags with a semi-white clear substance in it.” (R.1237.) Officer Charles Bailey testified that'this substance appeared to be methamphetamine. Also, the video shows Bo-hannon searching DuBoise’s pockets after the shootings. It is reasonable to conclude that drugs had some role in the shootings. Thus, evidence indicating that Bohannon attempted to buy drugs in the hours immediately before the shootings was part of the sequence of events leading to the murders and was admissible to establish the complete story surrounding the murders. See Revis v. State, 101 So.3d 247, 278 (Ala.Crim.App.2011)(“[T]he reference during the interview to Revis’s drug usage was.made to determine Revis’s connection to the victim and as a possible motive for the offense. Thus, it was evidence of part of the res gestae of the offense as Revis was accused of murdering Stidham during a robbery in which he stole pills from Stidham, and the evidence indicates that acquisition of the pills was the reason for the offense. The statements concerning Revis’s drug usage were therefore introduced as an exception to the exclusionary rule.”).'
Also, no notice was required here because the evidence was admissible as part of the res gestae.
“While the prosecution must ‘provide the defendant with notice and a hearing before trial if. it intends to offer such evidence’ of other crimes, no such notice is required when the ‘other crimes’ evidence is part of the res gestae. See [State v.] Falkins, 12-1654, p. 20, 146 So.3d [838] at 851 [ (La.Ct.App.2014) ] (‘Evidence admissible under the res ges-tae exception is not subject to any advance notice requirements by the State.’)-.”
State v. Rapp, 161 So.3d 103, 111 (La.Ct.App.2015).[6] See United States v. Dougherty, 321 Fed.Appx. 762, 766 (10th Cir. 2009) (not selected' for publication in the Federal Reporter) (“The district court concluded that the presence of the ammunition in [the defendant’s] luggage had evi-dentiary value and was ‘inextricably intertwined with the facts and circumstances of this case, the res gestae.’ Thus, it was intrinsic to the charged crime and not subject to the notice requirement of Rule 404(b).”); Goldsby v. State, 273 Ga.App. 523, 528, 615 S.E.2d 592, 598 (2005) (“[T]he evidence was admitted as part of the res gestae, and thus does not require such notice.”); People v. Young, 987 P.2d 889, 893 (Colo.App.1999) (“Res gestae evidence need not meet thé procedural requirements of evidence introduced pursuant to CRE 404(b).”); People v. Fox, 178 Misc.2d 1018, 1026, 683 N.Y.S.2d 805, 811 (1998)(“[T]he law is well settled that res gestae statement, i.e., declarations accompanying and elucidating the criminal transaction, are not subject to the notice requirement.”); United States v. Metz, 34 M.J. 349, 351 (C.M.A.1992) (“[Providing a notice requirement does not apply -to what *493 is commonly referred to as res gestae or intrinsic evidence.”).
Moreover, no limiting instruction was required in this case for the reasons set out by the Alabama Supreme Court in Johnson v. State, 120 So.3d 1119 (Ala.2006):
“It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense. Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged. See People v. Coney, 98 P.3d 930 (Colo.Ct.App.2004) (holding that evidence of other offenses or acts that are part and parcel of the charged offense is admissible as res gestae and may be admitted without a limiting instruction); State v. Long, 173 N.J. 138, 171, 801 A.2d 221, 242 (2002) (evidence of the defendant’s actions ‘served to paint a complete picture of the relevant criminal transaction’ and therefore was admissible, and limiting instruction was unnecessary because the evidence was admitted under the res gestae exception); and Camacho v. State, 864 S.W.2d 624, 536 (Tex.Crim.App.1993) (holding the evidence of the extraneous offenses showed the context in which the criminal act occurred, i.e., the res gestae, and was therefore admissible and not subject to the requirement of a limiting instruction).”
120 So.3d at 1129-30. See also Boyle v. State, 164 So.3d 171 (Ala.Crim.App.2013); Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011).
For the reasons stated above, the circuit court did not err in allowing evidence indicating that in the hours immediately before the murders, Bohannon, tried to purchase methamphetamine from two waitresses at the Lounge. Bohannon is due no relief on this claim.
VIII.
Bohannon next argues that the circuit court erred in allowing the security videotape footage of the shootings to be admitted into evidence. Specifically, he argues that the videotape was not admissible because, he says, there was no testimony from an expert who was familiar with the surveillance system installed at the lounge. (Bohannon’s brief at p. 68.)
Here, William Graves, the owner of the Paradise Lounge at the time of the shootings, testified that in 2010 he installed an elaborate surveillance system in and outside the lounge. His sister, Diane Perry Meyer, managed the property. Graves testified:
“[Graves]: In the lounge—in the back side of the lounge, we have an office area back there. And that office area stayed locked where no one could get there but me or my sister. And I had Southern Alarms put security cameras in. It was PC based. And you had to be in the office to do anything with it. It had about 8 cameras on the outside of the building and 14 or 15 cameras on the inside of the building.
“And, inside, there was also a TV out in the bar area that showed several of the outside cameras, that it would rotate from one to the other so if people were sitting there, they could mostly see their cars and things like that outside.
*494 “[Prosecutor]: And was there any other monitor attached to that system?
“[Graves]: There was a monitor in the office. So you either had to be in the office or watching the outside ones from out there. But the only way to go back and look at anything backwards or do anything with the computer, you had to be in the office where it was locked up.
“[Prosecutor]: Okay. And who had access to that office?
“[Graves]: Ma’am?
“[Prosecutor]: Who had access to that office?
“[Graves]: Me and my sister.
“[Prosecutor]: Anybody else?
“[Graves]: No.
“[Prosecutor]: Okay. Was it locked with just a regular key?
“[Graves]: Regular doorknob key.
“[Prosecutor]: All right. And what about security on the actual [personal computer] that you mentioned; was there security there?
“[Graves]: Yes. You did have an administrator code on it. I’m the only one that had the administrator code. And so if you wanted to change anything or record anything, like that, you had to put it in administrative mode.
[[Image here]]
“[Prosecutor]: Okay. Was there a date time stamp on the security footage system?
“[Graves]: Yeah”
(R. 1107-09.)
When the videotape was first offered into evidence defense counsel specifically stated: “We have no objection to it.” (R. 1115). Thus, we consider this issue only for plain error. See Rule 45A, Ala. R.App. P.
“The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the ‘silent witness’ foundation must be laid. Under the ‘silent witness’ theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the ‘silent witness’ theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.1980) ] test. Rewritten to have more general application, the Voudrie standard requires:
“(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
“(2) a showing that the operator of the device or process or mechanism was competent,
“(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
“(4) a showing that no changes, additions, or deletions have been made,
“(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
“(6) identification of the speakers, or persons pictured, and
“(7) for criminal cases only, a showing that any statement made in the re *495 cording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.”
Ex parte Fuller, 620 So.2d 675, 678 (Ala.1993).
Surveillance footage is admissible under the silent-witness theory, and Alabama has not required the testimony of an expert in order for that footage to be admitted under that theory. As this Court stated in Spradley v. State, 128 So.3d 774 (Ala.Crim.App.2011):
“In Pressley v. State, 770 So.2d 115 (Ala.Crim.App.1999), this Court applied the requirements necessary for introducing a video under the silent-witness theory:
“ ‘[The police officer] then identified the exhibit as the videotape he had removed from the surveillance VCR at the pawnshop, testified that it was kept in his sole custody, except for a day when it was released to the FBI, and testified that it was in the same condition at trial, and that there had been no changes on the videotape, as when he first viewed the videotape. It was after this testimony that the trial court admitted the surveillance videotape into evidence.
“ ‘By calling a witness with expertise in surveillance camera systems, the State properly established that the pawnshop’s surveillance system was in proper working order and capable of recording accurately what was happening in the area of the pawnshop it was focused on. [The police officer’s] testimony indicated that the videotape recording was correct and authentic. Therefore, the State properly satisfied the elements of the Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.1980) ] test as articulated by the Alabama Supreme Court in Ex parte Rieber, [663 So.2d 999 (Ala.1995) ].’
“770 So.2d at 132-33. See also Washington v. State, 406 Md. 642, 653, 961 A.2d 1110, 1116 (2008) (‘Courts have admitted surveillance tapes and photographs made by surveillance equipment that operates automatically when “a witness testifies to the type of equipment or camera used, its general reliability, the quality of the recorded product, the process by which it was focused, or the general reliability of the entire system.” ’); Logue v. State, 529 So.2d 1064, 1068 (Ala.Crim.App.1988) (‘The purpose of laying a proper foundation for the admission of a tape recording is to show that the [depiction on the tape] was accurately recorded and preserved,’).”
128 So.3d at 782.
In this case, Graves testified that when police arrived at the lounge they asked him for camera footage of the parking lot where the shootings occurred, that he took an officer to the camera room where they watched three different recordings of the shootings, that he telephoned the individual who had serviced the system and asked him to come to the lounge, and that, when the technician arrived, the technician copied the three different videos of the shootings. (R. 1114.) Graves testified that all of this was done in his presence.
“Here, defendant does not challenge the chain of custody of the copy of the surveillance video footage. Instead, defendant suggests that the authentication of the surveillance video footage was deficient in a manner similar to the deficiencies identified by this Court in State v. Mason, 144 N.C.App. 20, 550 S.E.2d 10 (2001). In Mason, although the store’s employee and general manager testified at trial that the surveillance system ‘was ‘in working order’ at the time that their store was robbed, ‘neither one knew anything about the maintenance or operation of the camera sys *496 tem’; one testified that she ‘could not even operate her home VCR,’ and the other ‘admitted that he did not know “how the doggone thing works,” ’ and none of the State’s witnesses testified that there was ‘any routine maintenance or testing of the ... security system.’ Mason, 144 N.C.App. at 26, 550 S.E.2d at 15. In the present case, defendant directs us to Mr. McDonald’s similar response to a question about how one of the surveillance cameras ‘work[s],’ where Mr. McDonald answered, ‘Exactly—I mean it’s on all the time. I don’t know anything about how this works.’ However, defendant neglects to mention Mr. McDonald’s response immediately following this statement to an almost identical question about how the camera ‘operate[s],’ where Mr.. McDonald answered: ‘It’s -a live streaming recording device that sends the imagine [sic] back to a server that records.’ Moreover, Mr, McDonald testified that he viewed the surveillance video as the technician made a copy of the footage immediately following the incident, and further testified that the footage presented in court was the same as that which he viewed when the copy was being made from the surveillance system’s server a few days after the theft. See, e.g., State v. Mewborn, 131 N.C.App. 495, 499, 507 S.E.2d 906, 909 (1998) (‘At trial, during voir dire ..., Lieutenant Boyd stated that the images on the tape had not been altered and were in the same condition as when she had first viewed them on the day of the robbery. Because Lieutenant Boyd viewed the tape on both the day of the robbery and at trial and testified that it was in the same condition and had not •been edited, there is little or no doubt as to the videotape’s authenticity.’). Taken together, we are not persuaded that the trial court abused its discretion by admitting the surveillance video footage in the present case.” ■
State v. Cook, 218 N.C.App. 245, 252-53, 721 S.E.2d 741, 747 (2012). See State v. Powers, 148 S.W.3d 830, 832 (Mo.Ct.App.2004). See also Hon, James G. Carr and Patricia L. Bellia, 2 Law of Electronic Surveillance § 7.59 (2009).
Graves’s testimony was sufficient to satisfy the silent-witness theory for admission of the videotapes of the shootings. The circuit court did not err in allowing the footage to be admitted and played to the jury. Bohannon is due no relief on this claim.
IX.
Bohannon next argues that the' circuit court erred in allowing the admission into evidence of the toxicology reports on the blood analysis of the two victims.
At the time that the two toxicology reports were offered into evidence, defense counsel said that he had no objection. (R. 1352.) Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Dr. Curt Harper, chief of the toxicology department with the Alabama Department of Forensic Sciences, testified that blood from the bodies of the two victims was drawn during the autopsies and submitted to his department for analysis. He testified that the chain of custody for the evidence filed by the department is electronic, that the samples are all assigned specific case numbers, that when a sample is transferred within the department, the bar code is scanned, and that he was in possession of the electronic chain of custody for the blood samples from the two victims. (R. 1351.) Harper further testified that a multitude of scientists worked on the two blood samples and that Rebecca Boswell reported the results. (R. 1353.) Dr. Harper testified that DuBoise had high levels *497 of methamphetamine and amphetamine in his blood, that the concentration was evidence of drug abuse, and that Harvey had methamphetamine and marijuana in his blood and that his levels were an indication of abuse of those substances.
Relying on Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), and Bullcoming v. New Mexico, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), Bohannon argues that the reports were out-of-court statements that were testimonial in nature and that his right to confront his accusers was violated when the scientist who performed the blood tests failed to testify at trial.
In this case, defense counsel made the following argument in his opening statement in the guilt phase of Bohan-non’s trial:
“And then Jerry DuBoise comes out and they—there’s some conversation. And DuBoise turns around and pushes Bohannon. And then they start to walk off again and he pushes him again.
“Now, it’s kind of odd conduct on the part of DuBoise. But then you realize that he had 1500 nanograms of methamphetamine in his system per milliliter of blood. That is extraordinarily high. It makes somebody aggressive. It makes them not really care. They’ve just—it’s an upper. Methamphetamine is.
[[Image here]]
“These guys have—the two guys that got killed had illegal guns. They had methamphetamine—both of them had methamphetamine in their system, and both of them were regulars at this night spot.”
(R. 1075.)[7] Thus, any possible error was invited by defense counsel’s argument.
“ ‘Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.’ Phillips v. State, 527 So.2d 154, 156 (Ala.1988). ‘The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error.’ ' Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003).”
Robitaille v. State, 971 So.2d 43, 59 (Ala.Crim.App.2005). The toxicology results corroborated a great portion of . Bohan-non’s defense. Thus, their admission did not adversely affect Bohannon’s substantial rights. Indeed, this testimony was helpful to Bohannon’s defense. Accordingly, Bohannon can show no error that “adversely affected his substantial rights.” Rule 45A, Ala. R.App. P. Bohannon can show no plain error in regard to this claim.
Moreover, confrontation violations are subject to a harmless-error analysis. See Bullcoming v. New Mexico, 564 U.S. at 668 n. 11, 131 S.Ct. at 2719, n.11 (2011). See also State v. VanDyke, 361 Wis.2d 738, 863 N.W.2d 626 (Wis.Ct.App.2015); Staples v. Commonwealth, 454 S.W.3d 803 (Ky.2014); Littlejohn v. Trammell, 704 F.3d 817 (10th Cir.2013). Melissa Weaver testified that on numerous occasions she had used methamphetamine with Harvey and DuBoise. (R. 1204.) Sharon Thompson also testified that she had frequently used methamphetamine with the two victims. (R. 1218.) If any error did occur in the admission of the toxicology reports, it was also harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Bohannon is due no relief on this claim.
*498 • X.
Bohannon next argues that the circuit court erred in excluding evidence that the two victims were each carrying a gun at the time of the shootings although they had no permits to carry concealed weapons. Specifically, he argues that this evidence was relevant to the issue of whether Bohannon acted in self-defense. He asserts that Alabama follows a liberal view of relevancy, which, he says, was satisfied in this case.
The record shows that the State moved in limine that the circuit court exclude any evidence indicating that the two victims were carrying weapons illegally. (R. 1078.) The circuit court took the matter under advisement. (R. 1081.) Bohannon was allowed to present evidence that he had a permit to carry his weapon, and evidence was introduced that the victims were armed. The circuit court did not allow evidence indicating that the two victims had no permits to carry them weapons.
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid.
In allowing a defendant to present evidence of prior bad acts committed by a victim, this Court has stated:
“ ‘Evidence of a person’s character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
[[Image here]]
“ ‘(2) Character of Victim.
“ ‘(A) In Criminal Cases, (i) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same.... ’
“Rule 404(a), Ala. R. Evid. The Advisory Committee’s Notes with regard to this Rule provide, in pertinent part:
“‘Generally, the evidence of a victim’s character allowed by this sub-subsection must be in the form of testimony regarding reputation or testimony stating an opinion, in accordance with Rule 405(a). See Government of the Virgin Islands v. Carino, 631 F.2d 226 (3d Cir.1980); United States v. Kills Ree, 691 F.2d 412 (8th Cir.1982); E. Cleary, McCormick on Evidence § 193 (3d ed.1984). Compare Higginbotham v. State, 262 Ala. 236, 78 So.2d 637 (1955) (holding that the accused in a homicide case may not prove the victim’s bad character via specific prior acts of misconduct); C. Gamble, McElroy’s Alabama Evidence § 26.01(1) (4th ed.1991). Such proof would come through the testimony of a character witness for the defense who relates either the victim’s general reputation for a pertinent trait or the witness’s own opinion of the victim’s character for the pertinent trait.
“ ‘Alabama case law permits a person charged with homicide or assault to prove, in support of a self-defense claim, that the alleged victim had a bad general reputation for violence. Williams v. State, 506 So.2d 368 (Ala. Crim. App. 1986), cert. denied, 506 So.2d 372 (Ala. 1987); Bankston v. State, 358 So.2d 1040 (Ala.1978). See also C. Gamble, McElroy’s Alabama Evidence § 33.01(1) (4th ed.1991); H.H. Henry, Annotation, Admissibility of Evidence as to Other’s Character or Reputation for Turbulence on Question of Self-Defense by One Charged With Assault or Homicide, 1 A.L.R.3d 571 (1965).’ ”
Peraita v. State, 897 So.2d 1161, 1186 (Ala.Crim.App.2003).
According to Rule 404(a), Ala. R. Evid., Bohannon was prohibited from presenting evidence of specific bad acts committed by the two victims. Evidence indicating that the victims did not have licenses to carry *499 concealed weapons was not admissible under Rule 404(a), Ala. R. Evid. The circuit court did not err in excluding this evidence. Bohannon is due no relief on this claim.
XI.
Bohannon next argues that the circuit court erred in allowing the State to introduce improper victim-impact evidence in the guilt phase of Bohannon’s trial.
Specifically, the record shows that Sandra Harvey, Anthony Harvey’s wife, testified that she called him “Andy” and that he was 45 years of age when he was killed. She identified a photograph of him as he appeared several years before the shootings. Also, Jerry DuBoise, Sr., Jerry Du-Boise’s father, testified that DuBoise was 24 years old when he was killed, that his friends called him “Little Jerry,” and that when he learned that his son had died he went to the bar and got into “trouble.” Last, Melissa Weaver testified that the two victims were her friends and that she loved them. Bohannon made no objection to any of the now challenged testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. '
“It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the defendant] did not receive a fair trial simply because the jurors were told what they probably had already suspected—that [the victim] was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 888, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
Ex parte Rieber, 663 So.2d 999, 1005-06 (Ala.1995).
Subsequently, the Alabama Supreme Court in Ex parte Cryrnes, 630 So.2d 125 (Ala.1993), found that the admission of improper victim-impact evidence in the guilt phase of a capital-murder trial, may be harmless.
“In determining whether the admission of improper testimony is reversible error, this -Court has stated that the reviewing court must' determine the ‘improper admission of the evidence ... might have adversely affected the defendant’s right to a fair trial,’ and before the reviewing court can , affirm a judgment based upon the ‘harmless error’ rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.”
630 So.2d at 126.
This Court has repeatedly refused to find reversible error in the admission of limited victim-impact evidence in the guilt phase of a capital-murder trial. See Russell v. State, [Ms. CR-10-1910, May 29, 2015] — So.3d -, -(Ala.Crim.App. 2015) (the prosecutor made the following statements in the guilt phase: “Eleven year old Katherine Helen Gillespie, a beautiful, bright, precious little girl with a future full of promise, loved by everyone, young and old alike.”); Shanklin v. State, 187 So.3d 734 (Ala.Crim.App.2014) (allowing victim’s wife’s testifimony about how she and the victim met and about their lives together); Lane v. State, 169 So.3d 1076 (Ala.Crim.App.2013) (allowing victim’s wife’s testifimopy concerning victim’s son’s feelings when he learned that his father had been killed); McCray v. State, 88 So.3d 1 (Ala.Crim.App.2010) (allowing victim’s .mother’s testifimony that victim had two children and gave the children’s names and ages); and Wilson v. State, 142 So.3d 732 (Ala.Crim.App.2010) (allowing testimony that victim had cancer and that his wife had died).
We likewise find no reversible error in the admission of the above-cited victim- *500 impact evidence in the guilt phase of Bo-hannon’s trial. Bohannon is due no relief on this claim.
XII.
Bohannon next argues that the circuit court erred in allowing the audio of the emergency 911 telephone calls to be admitted into evidence. Specifically, he asserts that these 911 calls were more prejudicial than probative and served only to inflame the jurors because the individual who called 911 was screaming hysterically and also testified at trial to what he observed.
The record shows that Robert Hoss testified that he was at the lounge when the shootings occurred and that he made a 911 call to report the shootings. During his testimony, the audio recordings of his calls, identified as State’s exhibits 13 and 100, were admitted into evidence. A certificate of authenticity was also admitted. Those exhibits were admitted without objection from, defense counsel. (R. 1181.) Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“[Emergency] 911 telephone calls can be relevant to corroborate witnesses’ testimony and to illustrate what actually took place.” Lewis v. State, 970 P.2d 1158, 1172 (Okla.Crim.App.1998). “The court ... properly exercised its discretion in admitting a tape of a 911 cali made during this incident, in which screams are heard. The tape was relevant to corroborate some of the testimony, and it was not so inflammatory that its prejudicial effect exceéded its probative value.” People v. Harris, 952 N.Y.S.2d 552, 554, 99 A.D.3d 608, 608-09 (2012). See also Stuart D. Murray, Admissibility of Tape Recording or Transcript of “911” Emergency Telephone Call, 3 A.L.R.5th 784 (1992).
“Appellant further alleges that the trial court erred in admitting into evidence the 911 tape made of Mr. Butler’s call for help during the robbery of the 61st and Union store. In the approximately forty-five (45) second tape, Mr. Butler is heard calling for help immediately after being shot the first time by Appellant, The phone lines remained open as the Appellant re-entered the store and continued his assault on Mr. Butler. While the screams emanating from Mr. Butler as Appellant re-entered the store are admittedly disturbing, this, does not render the tape inadmissible. The probative value of the tape; specifically, its corroboration of Mr. Butler’s testimony, and its illustration of what actually took place during the commission of the offense, far outweighed any prejudice to the Appellant.”
Pickens v. State, 850 P.2d 328, 335 (Okla.Crim.App.1993).
The 911 telephone calls were correctly admitted into evidence because their probative value outweighed any prejudice to Bohannon. Bohannon is due no relief on this claim.
XIII.
Bohannon next argues that numerous instances of prosecutorial misconduct denied him a fair trial and require that his conviction and sentence be reversed.
“ ‘In judging a prosecutor’s closing argu-mentj the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead [v. State], 585 So.2d [97,] 107 [(Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). ‘A prosecutor’s statement must *501 be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.’ Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538[528] U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, ‘statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.’ Bank-head, 585 So.2d at 106. ‘Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.’ Bank-head, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.”
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000). “A prosecutor may argue every legitimate inference from the evidence ‘and may examine, collate, shift and treat the evidence in his own way.’ ” Woodward v. State, 123 So.3d 989, 1028 (Ala.Crim.App.2011).
Bohannon did not object to any of the now challenged instances of prosecuto-rial misconduct.
“‘While this failure to object does not preclude review in a capital ease, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990).
With these principles in mind, we review the challenged arguments.
A.
First, Bohannon argues that the prosecutor urged the jury to disregard the law on self-defense when he made the following argument:
“Now, the defense in this case, what they’ve put on is self-defense. And here’s the deal. No matter how hard we try to do the legal jargon and how many words they try to trip you up on, and how much—you know, well, I’m—you know, lawyers know this. And you guys just listen to the law. Use your common every day sense when you hear this. What is self-defense?
“Now, I’m going to tell you what I expect the Judge will instruct you on the law of self-defense is. But, at all times, I want you guys to remember to use your common every day sense in determining self-defense.”
(R. 1457)(emphasis added).[8]
There is no plain error in urging the jurors to use common sense in their deliberations. “The prosecutor merely urged the jury to use common sense in determining whether Wilson was guilty. The com *502 ments were certainly not outside the wide latitude a prosecutor is allowed when discussing the evidence.” State v. Wilson, 93 P.3d 745, 745 (Kan.App.2004). See also State v. Morgan, 14 N.E.3d 452, 464 (Ohio Ct.App.2014) (“The [defendants] also take exception to the state asking the jury to use its common sense when the case focused primarily on expert testimony. Yet, contrary to the Morgans’ claim otherwise, the request for the jury to use its common sense has been determined to be neither prosecutorial misconduct nor plain error.”).
The prosecutor’s argument did not constitute error, much less plain error. Bo-hannon is due no relief on this claim.
B.
Bohannon argues that the prosecutor erred in making the following argument:
“After they were shot, he beat them and stomped on them and kicked them, and to the point he broke a .357 magnum over Anthony Harvey’s head, broke the handle off because he was hitting so hard, fractured his skull.
“At what point in that kicking and that beating is he so afraid for his life, that he’s so in peril of eminent danger that he decided to kick and stomp on his dead body.”
(R. 1466.)
“A prosecutor is entitled to argue forcefully for the defendant’s conviction. ‘[E]nthusiatic rhetoric, strong advocacy, and excusable hyperbole’ are not grounds for reversal. The jury are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides.”
Commonwealth v. Wilson, 427 Mass. 336, 350, 693 N.E.2d 158, 171 (1998).
The prosecutor’s argument did not constitute error, much less plain error. Nor did it so infect Bohannon’s trial with unfairness that he was denied due process. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Bohannon is due no relief on this claim.
C.
Bohannon next argues that the prosecutor erred in making the following argument:
“Now, manslaughter is another charge—another lesser included offense. It’s capital murder, intentional murder, and the next charge is manslaughter.
“In order to prove—in order for you to convict him of manslaughter, you have to believe that the defendant was lawfully provoked to do the act which caused the death of the deceased by a sudden heat of passion before reasonable time for the passion to cool and for reason to assert [itself],
‘You have to believe that a push would drive someone so over the edge that they would commit that murder just because of a push and that that’s reasonable for him to do so. Because it says the defendant was lawfully provoked.
“And I’m going to ask you—that’s the same highlight—lawfully provoked. And lawfully provoked is, must have been provoked at the time he did the act, must have been deprived of self-control by the provocation which he received. The state of mind must be that such a suddenly excited passion suspends the exercise of judgment. But it’s not required that the passion be so overpowering as to destroy violation [sic].
“Again, deprived of self control and suspended the exercise of judgment that would make it lawful.
“If you think it’s lawful for somebody to push you, so that means you can kill *503 them and their Mend? That’s what they’re asking for is manslaughter.”
(R. 1470-71.)
As the State argues in brief, the definitions set out by the prosecutor are contained in the pattern jury instructions for heat-of-passion manslaughter.
“ ‘Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion-heated blood—caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given....’”
Easley v. State, 246 Ala. 359, 362, 20 So.2d 519, 522 (1944), quoting Reeves v. State, 186 Ala. 14, 16-17, 65 So. 160 (1914).
The prosecutor’s arguments were consistent with the law and did not constitute error, much less plain error. Bohannon is due no relief on this claim.
D.
Bohannon next argues that the prosecutor shifted the burden of proof by making the following argument:
“And when you use deadly force for self-defense, a person may use deadly force in order to defend himself if he reasonably believes that the other person is using or about to use unlawful deadly physical force, or committing or about to commit either an assault first or second degree.
“Assault first or second degree is either with serious physical injury or with a weapon. And there is no evidence— no evidence put to you—none that Jerry Bohannon thought that there was a weapon coming out, that they had a weapon, that they were about to commit an assault in the first degree or second degree. None.”
(R. 1460.)
“‘The test of a prosecutor’s legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument; Kirkland v. State, 340 So.2d 1139 (Ala.Crim.App.), cert. denied, 340 So.2d 1140 (Ala.1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Crim.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Crim.App. 1978).’ ”
Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980).
The prosecutor’s arguments did not so infect Bohannon’s trial with unfairness that he was denied due process. See Darden v. Wainwright, supra.
E.
Bohannon next challenges the following arguments:
“In order to prove—in order for you to convict him of manslaughter, you have to believe that the defendant was lawfully provoked to do the act which *504 caused the death of the deceased by a sudden heat of passion before reasonable time for the passion to cool and for reason to assert itself.”
(R. 1470.) The State admits that the prosecutor did misstate the law and that the correct definition would be that the “State must prove the absence of lawful provocation beyond a reasonable doubt.” (State’s brief at p. 77.)
However, “[statements of counsel in argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the information of the verdict.” Orr v. State, 462 So.2d 1013, 1016 (Ala.Crim.App.1984).
The circuit court gave the following instruction: “You have heard the lawyers make their closing arguments. I will tell you again, as I’ve told you several times, that what the attorneys have told you is not the evidence.” (R. 1609.) Later in the court’s instructions, the court again stated:
“The attorney are officers of this Court. It is their duty to present evidence on behalf of their client, to make such objections as they deem proper, and to fully argue their client’s cause.
“An attorney’s statements and arguments are intended to help you understand the evidence and apply the law. However, they are not the evidence. And you should disregard any remark, statement or argument which is not supported by the evidence or by the law as given to you by this Court.”
(R. 1514-16.) Also, the circuit court properly instructed the jury that the State had the burden to prove the absence of legal provocation. See United States v. Davis, 491 Fed.App’x 48, 51-52 (11th Cir. 2012)(not selected for publication in the Federal Reporter)(holding that prosecutor’s misstatement concerning the burden of proof of defendant’s intent to defraud was not reversible error; “the district court correctly instructed the jury before closing argument began that the government bore the burden of proving Davis’s guilt beyond a reasonable doubt, that the burden never shifted to the defendant and that the attorney’s arguments were not evidence or instructions of law. Again, just prior to the jury’s deliberations, the district court correctly instructed the jury, inter alia, that good faith was a complete defense, and that the defendant did not have to prove good faith. Instead, the government was required to prove the defendant’s intent to defraud beyond a reasonable doubt.”). See also Windsor v. State, 89 So.3d 805, 814 (Ala.Crim.App.2009)(prosecutor’s comment in closing argument in capital-murder prosecution, that if defendant “is not guilty of capital murder, he ain’t guilty of nothing,” did not misstate the law concerning the jury’s choices of lesser-included offenses; prosecutor had the right to argue that the jury should convict defendant of the offense charged in the indictment).
We hold that the prosecutor’s argument did not so infect the trial with unfairness that Bohannon was denied due process. See Darden v. Wainwright, supra.
F.
Bohannon next challenges the following argument that the prosecutor made in rebuttal closing argument:
“The only two people who are acting in self-defense on that day were Jerry DuBoise, Jr., and Anthony Harvey. And they, did more than what the law required of them. They were both armed with guns. And under the law, when the defendant pulled his gun, and whatever it was he did that startled them—two grown men so much that they turned and ran—whatever it was at that moment, they, Andy and Little Jerry, could have stood them ground and *505 lawfully pulled their guns and lawfully used their guns to defend themselves. But they didn’t.”
(R. 1505-06.)
The prosecutor’s arguments did not constitute error, much less plain error. Bo-hannon is due no relief on this claim.
G.
Bohannon next argues that the prosecutor repeatedly made -disparaging remarks about Bohannon by stating that Bohannon was a “cold blooded killer,” that Bohannon’s “mind was bent on taking their lives,” and that Bohannon was hunting down his prey.
“The digest abounds with instances where the prosecutor has commented on the defendant’s character or appearance. Hall v. United States, 419 F.2d 582 (5th Cir.1969) (‘hoodlum’); Wright v. State, 279 Ala. 543, 188 So.2d 272 (1966) (‘Judas’); Rogers v. State, 275 Ala. 588, 157 So.2d 13 (1963) (‘a slick and slimy crow’); Watson v. State, 266 Ala. 41, 93 So.2d 750 (1957) (‘a maniac’); Weaver v. State, 142 Ala. 33, 39 So. 341 (1905) (‘beast’); Liner v. State, 350 So.2d 760 (Ala.Cr.App.1977) (‘a rattlesnake’ and ‘a viper’); Jones v. State, 348 So.2d 1116 (Ala.Cr.App.), cert. denied, Ex parte Jones, 348 So.2d 1120 (Ala.1977) (‘a purveyor. of drugs’); Kirkland v. State, 340 So.2d 1139 (Ala.Cr.App.), cert. denied, Ex parte Kirkland, 340 So.2d 1140 (Ala.1977) (‘slippery’); Jeter v. State, 339 So.2d 91 (Ala.Cr.App.), cert. denied, 339 So.2d 95 (Ala.1976), cert. denied, 430 U.S. 973, 97 S.Ct. 1661, 52 L.Ed.2d 366 (1977)(‘a Aim flam artist’); Cassady v. State, 51 Ala.App. 544, 287 So.2d 254 (1973) (‘a demon’); Reed v. State, 32 Ala.App. 338, 27 So.2d 22, cert. denied, 248 Ala. 196, 27 So.2d 25 (1946) (‘lied like a dog running on hot sand’); Williams v. State, 22 Ala.App. 489, 117 So. 281 (1928) (‘a chicken thief); Ferguson v. State, 21 Ala.App. 519, 109 So. 764 (1926) (‘a smart aleck’); Quinn v. State, 21 Ala.App. 459, 109 So. 368 (1926) (‘a wild catter’); Thomas v. State, 19 Ala.App. 187, 96 So. 182, cert. denied, Ex parte Thomas, 209 Ala. 289, 96 So. 184 (1923) (‘a moral pervert’);. Beard v. State, 19 Ala.App. 102, 95 So. 333 (1923) (‘seducer’).”
Barbee v. State, 395 So.2d 1128, 1134 (Ala.Crim.App.1981).
“We do not think that the mere characterization of the defendant as a [coldblooded killer whose mind was set on taking lives was] especially likely to stick in the minds of the jurors and influence their deliberations.” Barbee, 395 So.2d at 1135. The prosecutor’s argument did not constitute error, much less plain error. Neither did the argument so infect the trial with unfairness, that Bohannon was denied due process. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Bohannon is due no relief on this claim,
XIV.
Bohannon next challenges several of the circuit court’s jury instructions in the guilt phase of Bohannon’s trial.
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions' challenged are not to be isolated therefrom or taken out of context, but rather considered together.’” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
*506 Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).
“Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.”
Boyde v. California, 494 U.S. 370, 380-81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).
The instructions that Bohannon complains of were not objected to in the circuit court.
“In setting forth the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ ”
Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996). We now review the challenged arguments.
A.
First, Bohannon argues that the circuit court’s jury instruction on self-defense was erroneous because, he says, the instruction imposed a greater duty to retreat than does the current law on self-defense. He further asserts that the circuit court “conflated self-defense and provocation manslaughter.”
The record shows that the circuit court gave the following instruction:
“For the purpose of the defendant’s use of deadly physical force against another person to be justified, the deadly physical force must have been under the following circumstances:
“The defendant must have reasonably believed that Jerry DuBoise and/or Anthony Harvey were using or about to use unlawful deadly physical force against him; or the defendant must have reasonably believed that Jerry Du-Boise and/or Anthony Harvey were committing or about to commit either an assault in the 1st or 2nd degree.
“Deadly physical force is force which under the circumstances in which it is used is readily capable of causing death or serious physical injury.
“A reasonable belief is a belief formed in reliance upon reasonable appearances. It is a belief not formed recklessly or negligently. The test of reasonableness is not whether the defendant was correct in his belief, but whether the belief was reasonable under the circumstances existing at the time.
“Now, a person who is justified in using physical force, including deadly physical force, and who is not engaged in an unlawful activity and is any place where he has a right to be, has no duty to retreat and has the right to stand his ground.”
(R. 1529) (emphasis added). At the conclusion of the instructions, the prosecutor stated that he did not hear the circuit court instruct the jury about “imminent peril and urgent necessity.” The circuit court agreed and then gave the following instruction:
“But I need to tell you that, in the area of manslaughter, that the law requires that a belief of [imm]inent peril and urgent necessity to kill in self-defense, though it may be based on appearance, must be well-founded and there must be evidence that a reasonable person under the circumstances *507 would have honestly entertained that action.
“I charged you on murder, intentional murder, and I charged you on lawful provocation.
“I will admit to you that when I turned my page, I turned to the wrong page and I didn’t complete all of my charge. So I’m going to charge you again on lawful provocation.
“Lawful provocation means that the defendant was moved to do the act which caused the death of the deceased by a sudden heat of passion and before there had been reasonable time for the passion to cool and reason to reassert itself.
“The defendant must have been provoked at the time he did the act; that is, he must have been deprived of self-control by provocation which he received. The state of mind must be such that the suddenly excited passion suspends the exercise of judgment. But it is not required that the passion be so overpowering as to destroy volition.
“A kill in sudden passion excited by sufficient lawful provocation is manslaughter only.
“The law presumes that the passion disturbed the defendant’s reasoning and led him to act regardless of the admonition of law.
“Now, that should be considered in the charge on murder and manslaughter. But it should only be taken as the whole charge I’ve given you, everything from the beginning to the end, and is not intended to be highlighted by the fact that I’m having to additionally charge you at this time.”
(R. 1539-^fO) (emphasis added). Both the State and defense counsel indicated that they had no exceptions to the circuit court’s instructions; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.[9]
It appears that the circuit court misspoke when it gave the additional instructions to the jury and said “manslaughter” rather than “self-defense.” However, in the circuit court’s second instruction, the court limited the application the second instruction to the lesser-included offenses of manslaughter and murder. The circuit court charged the jury on capital murder, murder, and manslaughter. (R. 1520-26.) The circuit court’s instructions on capital murder and self-defense were consistent with current law.
Section 13A-3-23, Ala.Code 1975, as amended effective June i, 2006, states:
“(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose. A person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of *508 another'person ... if the person reasonably believes that another person is:
“(1) Using or about to use unlawful deadly physical force.
[[Image here]]
“(b) A person who is justified under subsection (a) in using physical force, including deadly physical force, and who is not engaged in' an unlawful activity and is in any place where he or she has the right to be has no duty to retreat and has the right to stand his or her ground.
“(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force if:
“(1) With intent to cause physical injury or death to another person, he or she provoked the use of unlawful physical force by such other person.
. “(2) He or she was the initial aggressor, except that his or her use of physical force upon another person under the circumstances is justifiable if he or she withdraws from the encounter and effectively communicates to the other person his or her intent to do so,- but the latter person nevertheless continues or threatens the use of unlawful physical force....”
The 2006 amendment eliminated from § 13A-3-23(b), Ala.Code 1975, the duty to retreat. Now an individual has a right to stand his ground as long as that person is not engaged in illegal activity.
Subsequent to the 2006 amendment, this Court has had occasion to consider the validity of a circuit court’s'instructions on self-defense. In George v. State, 159 So.3d 90 (Ala.Crim.App.2014), this Court found reversible error in an instruction that stated: “The, defendant is not justified in using deadly physical force upon another person and cannot prevail on the issue of self-defense if it reasonably appeal’s or the defendant knows that he can avoid the necessity of using such force with complete safety by retreating.” 159 So.3d at 92. In Blake v. State, 61 So.3d 1107 (Ala.Crim.App.2010), this Court found that the circuit court’s instructions on self-defense were erroneous because the instruction read that a person could hot rely on self-defense unless “there [was] no convenient mode of escape by retreat or declining to combat.” 61 So.3d at 1108. In Williams v. State, 46 So.3d 970 (Ala.Crim.App.2010), this Court found error in the following instruction: “ ‘The defendant is not justified in using deadly physical force upon another person, arid cannot prevail on the issue of self-defense if it reasonably appears or the Defendant knows that he can avoid the necessity of using such force with complete safety by retreating....’ ” 46 So.3d at 970. See also Jason W. Bobo, Following the Trend: Alabama Abandons the Duty to Retreat and Encourages Citizens to Stand Their Ground, 38 Cumb. L.Rev. 339, 362-63 (2008).[10]
Our neighboring State of Florida, the State that served as the basis for Alabama’s adoption of our current “stand your ground law,” has adopted a pattern jury instruction on this issue. The instruction reads as follows:
“If the defendant was not engaged in an unlawful activity and was attacked in any place where he had a right to be, he had no duty to retreat and had’the right to stand his ground and meet force with force, including deadly force, if he rea *509 sonably believed that it was necessary to do so to prevent [ ] death or great bodily harm to himself or to prevent the commission of a forcible felony.”
Fla. Std. Jury Instr. (Crim.) 3.6(f) (2011).
Assuming that error did occur in the circuit court’s second instruction, we hold that any error was harmless beyond a reasonable doubt. The United States Supreme Court in Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), addressed harmless error in regard to jury instructions and stated:
“We have recognized that ‘most constitutional errors can be harmless.’ [Arizona v.] Fulminante, [499 U.S. 279, at 306 (1991) ]. ‘[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.’ Rose v. Clark, 478 U.S. 570 (1986). Indeed, we have found an error to be ‘structural,’ and thus subject to automatic reversal, only in a ‘very limited class of cases.’ Johnson v. United States, 520 U.S. 461, 468 (1997) (citing Gideon v. Wainwright, 372 U.S. 335 (1963) (complete denial of counsel); Tumey v. Ohio, 273 U.S. 510 (1927) (biased trial judge); Vasquez v. Hillery, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); McKaskle v. Wiggins, 465 U.S. 168 (1984) (denial of self-representation at trial); Waller v. Georgia, 467 U.S. 39 (1984) (denial of public trial); Sullivan v. Louisiana, 508 U.S. 275 (1993) (defective reasonable-doubt instruction)).
“The error at issue here—a jury instruction that omits an element of the offense—differs markedly from the constitutional violations we have found to defy harmless-error review. Those eases, we have explained, contain a ‘defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.’ Fulminante, supra, at 310. Such errors ‘infect the entire trial process,’ Brecht v. Abrahamson, 507 U.S. 619, 630 (1993), and ‘necessarily render a trial fundamentally unfair,’ Rose, 478 U.S., at 577. Put another way, these errors deprive defendants of ‘basic protections’ without which ‘a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair.’ Id., at 577-578.
“Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. Our decision in Johnson v. United States, supra, is instructive. Johnson was a perjury prosecution in which, as here, the element of materiality was decided by the judge rather than submitted to the jury. The defendant failed to object at trial, and we thus reviewed her claim for ‘plain error.’ Although reserving the question whether the omission of an element ipso facto ‘“affect[s] substantial rights,”’ 520 U.S., at 468-469, we concluded that the error did not warrant correction in light of the ‘ “overwhelming” ’ and ‘uncontroverted’ evidence supporting materiality, id., at 470. Based on this evidence, we explained, the error did not ‘ “seriously affec[t] the fairness, integrity or public reputation of judicial *510 proceedings.” ’ Id., at 469 (quoting United States v. Plano, 507 U.S. 725, 736 (1993)).”
527 U.S. at 8-9. See also Hedgpeth v. Pulido, 555 U.S. 57, 129 S.Ct. 530, 172 L.Ed.2d 388 (2008).
“[W]e acknowledged that faulty jury instructions are subject to harmless error review. [State v. Beamon, 347 Wis.2d 559, 830 N.W.2d 68 (2013)], ¶ 24, (citing Hedgpeth v. Pulido, 555 U.S. 57, 61, 129 S.Ct. 530, 172 L.Ed.2d 388 (2008); Neder v. United States, 527 U.S. 1, 11, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Harmless error review applies both to jury instructions that have omissions and to jury instructions that place an additional burden on the State. Id., ¶¶ 24-25. ‘Therefore, where a jury instruction erroneously states the applicable statute, we must determine whether, under the totality of the circumstances, the erroneous instruction constituted harmless error.’ Id., ¶ 27 (citing [State v.] Harvey, 254 Wis.2d 442, ¶ 46, 647 N.W.2d 189 [ (2002) ]).”
State v. Williams, 364 Wis.2d 126, 148, 867 N.W.2d 736, 746 (2015).
Here, there was no rational basis that would support a jury instruction on heat-of-passion manslaughter. Three cameras recorded the shootings. Rarely does a reviewing court have the means to review this issue with such clarity. It is clear from the videotapes that one victim did initially gently shove Bohannon; however, that act is not sufficient to constitute legal provocation for heat-of-passion manslaughter. After one victim shoved Bo-hannon, both victims turned their backs to Bohannon and started to walk toward their vehicle when Bohannon grabbed his gun from the back waistband of his pants and rushed after the two victims with his gun pointed at them. The victims then ran away from Bohannon and attempted to hide.
“ ‘Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion-heated blood—caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given.”
Easley v. State, 246 Ala. 359, 362, 20 So.2d 519, 522 (1944), quoting Reeves v. State, 186 Ala. 14, 16-17, 65 So. 160 (1914).
“Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.”
Spencer v. State, 58 So.3d 215, 245 (Ala.Crim.App.2008).
“A minor or technical assault or battery is insufficient, but a blow inflicting considerable pain or injury ordinarily is sufficient Easley v. State, 246 Ala. 359, 20 So.2d 519 (1945); Buffalow v. State, 219 Ala. 407, 122 So. 633 (1929). Mere abusive or opprobrious words or insulting gestures are insufficient. Cates v. State, 50 Ala. 166 (1874); Easley v. State, supra; Weaver v. State, 1 Ala.App. 48, 55 So. 956, rehearing denied, 2 Ala.App. 98, 56 So. 749 (1911). In a mutual fight where no more than ordi *511 nary battery was intended, the blows may constitute provocation, but use of deadly weapon or undue advantage is usually murder. Diamond v. State, 219 Ala. 674, 123 So. 55 (1929); Lanier v. State, 31 Ala.App. 242, 15 So.2d 278 (1943).”
Commentary to § 13A-6-3, Ala.Code 1975.
In Living v. State, 796 So.2d 1121 (Ala.Crim.App.2000), this Court found that the circuit court did not err in refusing to give a jury instruction on heat-of-passion manslaughter after the victim had shoved the defendant. We stated:
“ ‘[A]n extreme emotional or mental disturbance, without legally recognized provocation, will not reduce murder to manslaughter.’ MacEwan v. State, 701 So.2d [66,] 70 [(Ala.Crim.App.1997)]. (quoting Gray v. State, 482 So.2d 1318, 1319 (Ala.Crim.App.1985)). Moreover, [the victim] shoving [the defendant] during an argument does not constitute legal provocation for heat-of-passion manslaughter. ‘A minor technical assault which did not endanger life or inflict serious physical injury or inflict substantial and considerable pain would not amount to sufficient provocation.’ Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App.1985). Because no evidence of adequate legal provocation was presented at trial, the trial court did not err in refusing to instruct the jury on heat-of-passion manslaughter.”
796 So.2d at 1130. See also Woolf v. State, 220 So.3d 338 (Ala.Crim.App.2014).
Furthermore, the videotapes clearly established that the murders occurred as part of one act or course of conduct. Thus, there was no rational basis from the evidence, as clearly established by the videotapes, for a jury instruction on two separate murders as defined in § 13A-6-2, Ala. Code 1975.
We have stated the following concerning plain error:
“ ‘ “ ‘Plain error’ arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” ’ Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981)). See also Ex parte Woodall, 730 So.2d 652 (Ala.1998). ‘ “In other words, the plain-error exception to the contemporaneous objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” ’ Ex parte Land, 678 So.2d 224, 232 (Ala.1996) (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982))). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court may take appropriate action when the error ‘has or probably has adversely affected the substantial rights of the appellant.’ Rule 45A, Ala. R.App. P. ‘[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.’ Ex parte Woodall, 730 So.2d at 657 (citing Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)).”
Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002).
Given that the facts did not support an instruction on heat-of-passion manslaughter or murder as clearly shown by the *512 videos- of the events leading up to the double homicide, we cannot say that the circuit court’s second instruction constituted plain error or that it “adversely affected the appellant’s substantial rights.” Because Bohannon was not entitled to a jury instruction on heat-of-passion manslaughter or murder, “any mistakes by the trial court in its instructions ... were, at worst, harmless error not necessitating a new trial.” State v. Reid, 335 N.C. 647, 672, 440 S.E.2d 776, 790 (1994). See also State v. Blanks, 313 N.J.Super. 55, 64, 712 A.2d 698, 702 (1998) (“[I]f the evidence does not support the charge, then any error in the charge is harmless.”).
For the above stated reasons, we find no plain error in the circuit court’s second or supplemental jury instructions. Bohannon is due no relief on this claim.[11]
B.
Bohannon next argues that the circuit court erred in failing to sua sponte give the jury an instruction on intoxication as a defense.
Neither Bohannon nor the State moved the circuit court to instruct the jury on intoxication. Therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In Gurley v. State, 639 So.2d 557 (Ala.Crim.App.1993), this Court, addressed whether the circuit court erred in failing sua sponte to give an instruction on voluntary intoxication and reckless manslaughter. Refusing -to find plain error, this Court stated:
“The -trial court’s- failure to charge on reckless manslaughter does not, however, constitute plain error in this case.
The appellant’s decision to rely on self-defense, which constitutes an admission of intentional conduct, necessarily means that there was no obvious and egregious error in the court’s failing to instruct the jury on the principles of reckless conduct.
“ ‘It is a well accepted principle of law that a claim of self-defense necessarily serves as an admission that one’s conduct was intentional.... [A] person simply cannot .,. recklessly defend himself. The decision to defend one’s self, whether justified or not, is by its very nature a conscious and intentional decision. If a jury decides that a person is justified in using deadly force to defend himself then he or she is not guilty of any crime, and the defense is perfect. Conversely, if a jury determines that a person-is not justified in using deadly force to defend himself then that person is guilty of either- murder or simple manslaughter. Our legislature has specifically rejected the notion that any other result can attach where self-defense is concerned.’
“Lacy v. State, 629 So.2d 688, 689 (Ala.Cr.App.) (on ‘rehearing) (emphasis added), cert. denied, 629 So.2d 691 (Ala.1993).
“ ‘ “ ‘Plain error’ only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” ’ Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). The appellant did not request an instruction on reckless manslaughter. His defense strategy was to convince the jury that *513 his intentional decision to defend himself by killing Bentley was justified, rather than to persuade the jury that he was unable to form the intent to kill because he was intoxicated. The trial court’s failure to give a reckless manslaughter instruction was not a ‘ “particularly egregious error” and would not result in a miscarriage of justice if a reversal [on this issue] was denied.’ Ex parte Womack, 435 So.2d at 769 (accused ‘never indicated any reliance on such a defense [that mere presence was insufficient for complicity]; that is, instead of defending on the basis that he had no intent to kill but only to rob, his defense was alibi’). See also Ex parte Harrell, 470 So.2d 1309, 1314 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985) (because ‘the defendant’s defense was substantially based upon the claim that the killing [of a police officer] was accidental, the defendant raised no objection to the instruction to the jury, and he did not request the court to instruct the jury on the element of [the accused’s] knowledge [that the victim was a police officer], this case is distinguishable from [Ex parte] Murry, [455 So.2d 72 (Ala.1984) ],’ wherein the court held that the trial judge erred in failing to give a requested instruction that the accused, at the time of the murder, must have known that the victim was an on-duty police officer).”
639 So.2d at 560-61 (emphasis in original).
In Hunt v. State, 659 So.2d 933 (Ala.Crim.App.1994), this Court stated:
“The appellant contends that the trial court erred in failing to instruct the jury on voluntary intoxication.
“In his oral instructions to the jury, the trial judge instructed the jury on intentional murder and felony murder as lesser included offenses of the capital crimes charged in the indictment. Defense counsel raised no objection to those particular portions of the oral charge and, on one occasion, announced ‘satisfied.’ R. 881, 882, 888. The trial judge repeatedly instructed the jury on the definition of intent and the requirement that the killing have been intentionally committed. Although there was evidence that the appellant had consumed alcohol and drugs shortly before the murder, the trial judge was not requested to and did not instruct the jury on the legal principles of intoxication in connection with criminal liability. No objection was made at trial to the court’s failure to give such an instruction.
“In Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App.1993), the trial court did not instruct the jury on the legal principles of intoxication and this Court found that that omission constituted plain error. In Fletcher however, the trial judge, sua sponte, stated at the close of the State’s case that he would not give a charge on intoxication because he ‘ “did not get the impression from the evidence that [the defendant] was so- intoxicated that he didn’t know what he was doing.” ’ 621 So.2d at 1018. We held that this determination by the trial court ‘ “invaded the exclusive province of the jury,”’ id. at 1021, and, under the particular facts involved, amounted to plain error.
“In contrast, in the instant case, the matter of an intoxication charge was not raised by anyone at the guilt phase of the trial. In fact, defense counsel objected to the references during the trial to the appellant’s drug use and, in addition to the appellant’s defense that he did not commit the murder, defense counsel suggested during closing argument that, at most, the evidence sup *514 ported a conviction of intentional murder only. Thus, it appears that the appellant’s defense strategy was to convince the jury either that he did not commit the murder or that the killing was intentionally done, but without sexual overtones. There was no claim that he was unable to form the intent to kill because he was intoxicated. Where, as in this case, an intoxication instruction would conflict with defense strategy, there is no plain error in the trial court’s failure to give such an instruction. Gurley v. State, 639 So.2d 557, 560-61 (Ala.Cr.App.1993).”
659 So.2d at 957-58.
For the reasons stated in Gurley and Hunt, we likewise find no plain error in the circuit court’s failure to sua sponte charge the jury on intoxication when Bohannon relied on the theory of self-defense. Bo-hannon is due no relief on this claim.
XV.
Bohannon next argues that the multiplicitous indictments and convictions for the same murders violated the Double Jeopardy Clause. The State concedes that Bohannon is correct and that one of his capital-murder convictions must be vacated.
Two indictments were issued against Bohannon for violating § 13A-5-40(a)(10), Ala.Code 1975, by murdering Anthony Harvey and Jerry DuBoise pursuant to one act or pursuant to one course of conduct.
The first indictment read as follows:
“The Grand Jury of said County charges, that, before the finding of this indictment Jerry Dwayne Bohannon whose name is to the Grand jury otherwise unknown than as stated, did intentionally cause the death of another person, to-wit: Anthony Harvey, by shooting him with a gun, and did intentionally cause the death of another person, to-wit: Jerry DuBoise, by shooting him with a gun, pursuant to one scheme or course of conduct, in violation of § 13A-5-40(a)(10), of the Code of Alabama.”
(R. 84) (emphasis added). The second indictment read as follows:
“The Grand Jury of said County charges, that, before the finding of this indictment Jerry Dwayne Bohannon whose name is to the Grand jury otherwise unknown than as stated, did intentionally cause the death of another person, to-wit: Jerry DuBoise, by shooting him with a gun, and did intentionally cause the death of another person, to-wit: Anthony Harvey, by shooting him with a gun, pursuant to one scheme or course of conduct, in violation of § 13A-5-40(a)(10), of the Code of Alabama.”
(R. 85) (emphasis added). The only difference in the two indictments is that the names of the victims are transposed.
This Court has held that similar charges are alternative methods of proving the same offense and that convicting and sentencing a defendant for both offenses violates the Double Jeopardy Clause.
“[Parks] alleges that his constitutional protection against double jeopardy was violated when he was tried and convicted of counts one and two of his indictment for murder wherein two or more persons are murdered by one act or pursuant to one course or scheme of conduct when both counts reflect the murder of the same two people. We agree with his argument that counts one and two of his indictment represented the death of two persons committed by one act or course of conduct and merely reversed the order of the victim’s names in each count.... See, e.g., Hardy v. State, 920 So.2d 1117, 1121-22 (Ala.Crim.App. *515 2005); Perkins v. State, 897 So.2d 457, 461-62 (Ala.Crim.App.2004).”
Parks v. State, 989 So.2d 626, 634 (Ala.Crim.App.2007). See also Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000); Living v. State, 796 So.2d 1121 (Ala.Crim.App.2000); Stewart v. State, 601 So.2d 491 (Ala.Crim.App.1992), aff'd in part, rev’d in part on other grounds, 659 So.2d 122 (Ala.1993).
Accordingly, this case is due to be remanded to the Mobile Circuit Court for that court to set aside one of Bohannon’s capital-murder convictions and the sentence imposed for that conviction.
Penalty-Phase Issues
XVI.
Bohannon argues that it was error to use the murder of two or more persons both as an element of the capital-murder offense and as an aggravating circumstance that supports the death penalty.
Bohannon was indicted for violating § 13A-5-40(a)(10), Ala.Code 1975, which makes killing two or more person pursuant to one act or course of conduct a capital offense. Section 13A-5-49(9), Ala.Code 1975, provides that it is an aggravating circumstance to murder two or more person by one act or pursuant to one scheme or course of conduct.
“[Tjhere is no constitutional or statutory prohibition against double counting certain circumstances as both an element of the offense and an aggravating circumstance. See § 13A-5-45(e), Ala.Code 1975 (providing that ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing’). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (‘The fact that the aggravating circumstance duplicated one of the elements of .the crime does not make this sentence constitutionally infirm.’); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (AIa.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991). Because double counting is constitutionally permitted and statutorily required, Vanpelt is not entitled to any relief on this issue. § 13A-5-45(e), Ala. Code 1975.”
Vanpelt v. State, 74 So.3d 32, 89 (Ala.Crim.App.2009).
There was no error in double counting an element of the capital-murder offense both as an element of the crime and an aggravating circumstance. Bohannon is due no relief on this claim.
XVII.
Bohannon next argues that his sentence of death violates the Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and should be vacated because, he argues, the jury did not unanimously conclude that the aggravating circumstance existed and that the aggravating circumstance outweighed the mitigating circum *516 stances. He acknowledges that the Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), is contrary to his position on appeal.
The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), held that any fact that increases a penalty above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. This holding was extended to death-penalty cases in Ring v. Arizona.
In Ex parte Waldrop, the Alabama Supreme Court addressed the claim Bohan-non raises and stated:
“Ring [v. Arizona, 536 U.S. 584 (2002)] and Apprendi [v. New Jersey, 530 U.S. 466 (2000) ] do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in ‘an increase in a defendant’s authorized punishment .., ’ or ‘ “expose[ ] [a defendant] to a greater punishment....” ’ Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-46(f). The jury in this case found the existence of that one aggravating circumstance.... At that point, [the defendant] became ‘exposed’ to, or eligible for, the death penalty.”
859 So.2d at 1188. The court further stated: ,
“[T]he weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and .that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (‘Once the jury finds that the defendant falls within the legislatively defined category of persons eligible. for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.’); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (‘sentencing decisions rest on a. far-reaching inquiry into countless, facts and circumstances and not on the type of proof of particular elements that returning a conviction does’).”
859 So.2d at 1189. .
Here, the jury’s verdict in the guilt phase that Bohannon was guilty of murdering two people by one act or pursuant to one scheme or course of conduct made Bohannon eligible for the death penalty, the maximum punishment. Therefore, there was no Ring violation in this case. Bohannon is due no relief on this claim.
XVIII.
Bohannon next argues .that: the circuit court erred in allowing the prosecutor, to present victim-impact evidence at the penalty phase. Specifically, he argues that Mark Harvey, Anthony Harvey’s son, was allowed to. testify that his father’s death caused his mother to have a stroke; that Roxanne Weaver, Harvey’s sister, testified that his family celebrated Anthony’s birthday every year by ..singing Happy Birthday at his grave and releasing balloons; and that, Emily Buxton, Jerry Du-Boise’s girlfriend, testified that, she was three weeks pregnant when Jerry was killed and that his son would grow up without a father. (R.. 1585;. 1580;- 1572.) Bohannon asserts that this evidence was *517 not admissible because it was not relevant to any aggravating circumstance.
The United States Supreme Court stated the following concerning victim-impact evidence:
“As a general matter ... victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim’s ‘uniqueness as an individual human being,’ whatever the jury might think the loss to the community resulting from his death might be.”
Payne v. Tennessee, 501 U.S. 808, 823, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
Although some states have limited the admission of victim-impact evidence at a penalty phase to instances where that evidence is relevant to an aggravating circumstance, Alabama is not one of those states. See Laux v. State, 985 N.E.2d 739, 749 (Ind.App.2013) (“Victim impact testimony is not admissible in the sentencing phase of a capital trial if that testimony is irrelevant to the alleged aggravating factor.”); See also Joan T. Buckley, J.D., Victim Impact Evidence in Capital Sentencing Hearings—Post-Payne v. Tennessee, 79 A.L.R.5th 33 (2000).
“ ‘[W]e have repeatedly held that victim-impact evidence is admissible at the penalty phase of a capital trial. See Smith v. State, 213 So.3d 255, 299 (Ala.Crim.App.2009); Gissendanner v. State, 949 So.2d 956 (Ala.Crim.App.2006); Miller v. State, 913 So.2d 1148 (Ala.Crim.App.2004); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001); Smith v. State, 797 So.2d 503 (Ala.Crim.App.2000); Williams v. State, 795 So.2d 753 (Ala.Crim.App.1999).’ Lee v. State, 44 So.3d 1145, 1174 (Ala.Crim.App.2009).” Revis v. State, 101 So.3d 247, 296 (Ala.Crim.App.2011).
Alabama, like Florida, allows the admission of victim-impact evidence at the penalty phase, irrespective of whether that evidence is relevant to any aggravating or mitigating circumstance.
“Windom attacks the admissibility of testimony by a police officer during the sentencing phase of the trial. The police officer was assigned by her police department to teach an anti-drug program in an elementary school in the community in which the defendant and the three victims of the murders lived, and where the murders occurred. Two of the sons of one of the victims were students in the program. The police officer testified concerning her observation about one of these sons following the murder. Her testimony involved a discussion concerning an essay which the child wrote. She quoted the essay from memory: ‘Some terrible things happened in my family this year because of drugs. If it hadn’t been for DARE, I would have killed myself.’ The police officer also described the effect of the shootings on the other children in the elementary school. She testified that a lot of the children were afraid.
“Defendant asserts, first, that this evidence was in essence nonstatutory aggravation, relying upon Grossman v. State, 525 So.2d 833 (Fla.1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). Defendant does concede that subsequent to Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), this Court has held victim impact testimony to be admissible as long as it comes within the parameters of the Payne decision. See Stein v. State, 632 So.2d 1361 (Fla.), cert. denied, 513 U.S. 834, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994); Hodges v. State, *518 595 So.2d 929 (Fla.), vacated on other grounds, 506 U.S. 803, 113 S.Ct. 33, 121 L.Ed.2d 6 (1992). Both the Florida Constitution in Article I, Section 16, and the Florida Legislature in section 921.141(7), Florida Statutes (1993), instruct that in our state, victim impact evidence is to be heard in considering capital felony sentences. We do not believe that the procedure for addressing victim impact evidence, as set forth in the statute, impermissibly affects the weighing of the aggravators and miti-gators which we approved in State v. Dixon, 283 So.2d 1 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), or otherwise interferes with the constitutional rights of the defendant. Therefore, we reject the argument which classifies victim impact evidence as a nonstatutory aggravator in an attempt to exclude it during the sentencing phase of a capital case.”
Windom v. State, 656 So.2d 432, 438 (Fla.1995).
The circuit court committed no error in allowing victim-impact evidence to be presented at the penalty phase of Bohannon’s trial. Bohannon is due no relief on this claim.
XIX.
Bohannon next argues that the circuit court improperly excluded mitigating evidence by not allowing him to present evidence at his sentencing hearing that “sentencing someone to the death penalty is more expensive than sentencing him to life without parole.” (Bohannon’s brief at p. 63.)
During the penalty phase, Bohannon presented the testimony of Janann Mcln-nis, a capital-mitigation specialist. During her testimony, the following occurred:
“[Defense counsel]: Are you familiar with the costs and surrounding expenses in executing somebody versus housing somebody?
“[Mclnnis]: Yes.
“[Defense counsel]: What would you say it would cost to execute somebody?
“[Prosecutor]: Judge, I’m going to object. I don’t think this is an appropriate mitigating circumstance.
“The Court: I agree.”
(R. 1623.) After some discussion, the circuit court did not allow Mclnnis to testify about the cost of a life imprisonment without parole sentence versus a death sentence. (R. 1625.)
Many states that have considered this issue have found that evidence of the cost of the death penalty is not relevant to sentencing. See State v. Davis, 139 Ohio St.3d 122, 9 N.E.3d 1031 (2014) (“‘Evidence of cost effectiveness of the death sentence does not bear on a defendant’s character, prior record or the circumstances of the offense.’ Al-Mosawi v. State, 929 P.2d 270, 287 (Okla.Crim.App.1996). Moreover, ‘[o]nce the legislature has resolved to create a death penalty that has survived constitutional challenge, it is not the place of this or any court to permit counsel to question the ... economic wisdom of the enactment.’ ”); State v. Clark, 851 So.2d 1055, 1083 (La.2003) (“Testimony concerning the costs associated with incarceration and the imposition of the death penalty do not relate to the circumstances of the offense, the character of the defendant, or the impact on the victims.”); Smallwood v. State, 907 P.2d 217, 233 (Okla.Crim.App.1995) (“Appellant claims ... that he should have been allowed to present evidence of the cost effectiveness of the death penalty in mitigation of the imposition of that punishment. Appellant’s request was properly denied by the trial court as such evidence is irrelevant, and does not qualify as mitigating *519 evidence, having no bearing on Appellant’s character, prior record, circumstances of the offense committed or Appellant’s future conduct.”); State v. Kayer, 194 Ariz. 423, 440, 984 P.2d 31, 48 (1999) (“[T]he cost of execution cannot be considered a mitigating factor. The death penalty represents a legislative policy choice by the people’s representatives regarding the level of punishment for Arizona’s most serious criminal offenders, and it transcends a financial cost/benefit analysis.”).
In Alabama, § 13A-5-45(c), Ala.Code 1975, provides: “At the sentencing hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49,13A-5-51 and 13A-5-52.” We agree with the cases cited above that the cost of imposing the death penalty on a defendant is not relevant to sentencing. The circuit court correctly excluded this evidence. Bohannon is due no relief on this claim.
XX.
Bohannon next argues that the circuit court erred in characterizing the jury’s penalty-phase determination as a “recommendation.” Specifically, he asserts that this terminology undermined the jury’s sense of responsibility for the sentence and conflicted with Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The United States Supreme Court in Caldwell held: “It is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant’s death rests elsewhere.’ ” 472 U.S. at 328-29.
Subsequent to Caldwell, the United States Supreme Court has stated:
“[W]e have since read Caldwell as relevant only to certain types of comment— those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. Thus, to establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.”
Romano v. Oklahoma, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).
“ ‘ “It is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the accused’s death rests elsewhere. Caldwell [v. Mississippi, 472 U.S. 320 (1985) ]. However, comments that accurately explain the respective functions of the judge and jury are permissible under Caldwell as long as the significance of the jury’s recommendation is adequately stressed. Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987); Martin v. State, 548 So.2d 488 (Ala.Crim.App.1988), aff'd, 548 So.2d 496 (Ala.1989). In the instant case, neither the prosecutor nor the trial court misrepresented the effect of the jury’s sentencing recommendation. Their remarks clearly defined the jury’s role, were not misleading or confusing, and were correct statements of the law.”
Smith v. State, 213 So.3d 108, 163-64 (Ala.Crim.App.2000), reversed in part on other grounds, Ex parte Smith, 213 So.3d 214 (Ala.2003). See Treadway v. State, 924 N.E.2d 621, 639 (Ind.2010) (“[M]erely referring to the jury’s determination as a ‘recommendation’—the term used in the statute—did not run afoul of Caldwell because there was no intimation to the jury *520 that its recommendation was. ‘only a preliminary step’ and no suggestion that the jury was ‘not responsible’ for the ultimate sentence.”).
' There was no error in referring to the jury’s verdict in the penalty phase as a recommendation. Bohannon is due no relief on this claim.
XXI.
Bohannon next argues that the prosecutor’s arguments in the penalty phase were improper and erroneous and undermined the reliability of the sentencing determination. He makes three different arguments in support of this conclusion.
“ ‘In reviewing allegedly improper pros-ecutorial comments,. conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). ‘“Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), quoting United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 US. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala.Crim.App.2004).
Bohannon did not object to any of the now challenged instances of prosecutorial misconduct. Therefore, we review these claims for plain error. See Rule 45A, Ala. R.App. P. “Although the failure to object will not preclude [plain-error] review, it will weigh against any claim of prejudice.” Sale v. State, 8 So.3d 330, 345 (Ala.Crim.App.2008). We now review the claims of prosecutorial- misconduct.
A.
First, Bohannon argues that the prosecutor erred in making the following argument in closing at the penalty phase:
“And this is the portion of the trial where we are asking you, based on everything that you have heard, in the guilt phase, all of the evidence, all of the testimony, and in the penalty phase, to take all of this into consideration and to return a verdict of death.
“And we don’t do that lightly. We arsubmitting to you that the aggravating factors in this case do outweigh the mitigating factors in this case.”
(R, 1637.) Bohannon argues that the prosecutor implied that this case was particularly deserving of the death penalty and “improperly invok[ed] the prosecutorial mantle of authority.” (Bohannon’s brief, at p. 92.)
“A prosecutor’s comment about the number of times he or she has sought the death penalty is improper if it may be construed to be ‘similar to a prosecu-torial argument at trial to the effect that “we only prosecute the guilty.” ’ Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir. 1985), judgment vacated by Kemp v. Brooks, 478 U.S. 1016, 106 S.Ct. 3325, 92 *521 L.Ed.2d 732 (1986), reinstated on return to remand by Brooks v. Kemp, 809 F.2d 700 (11th Cir.1987). Viewing the above-quoted comments in context, we cannot conclude that those comments conveyed the argument that the prosecutor ‘only prosecutes the guilty,’ especially when the above-quoted comments reference the jury’s ‘duty.’ Thus, we cannot conclude that those comments rise to the level of plain error.”
Shanklin v. State, 187 So.3d 734, 789-90 (Ala.Crim.App.2014). “In our adversarial system of criminal justice, a prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate.” Vanpelt v. State, 74 So.3d 32, 91 (Ala.Crim.App.2009). The prosecutor’s argument was permissible and did not constitute error, much less plain error. Bohannon is due no relief on this claim.
B.
Second, Bohannon argues that the following argument that was made in the prosecutor’s rebuttal closing argument was improper:
“You saw it and you heard it. That man right there showed absolutely no mercy to his victims as he hunted them down like animals, shot them, and treated them worse than animals when he beat them and kicked them and went through their pockets. That’s not mercy. And he doesn’t deserve it in return.”
(R. 1654-55.) Bohannon asserts that the above argument improperly compared the rights of the victims to the rights of the defendant.
During closing, defense counsel asked that the jury show Bohannon mercy and not “continue the cycle of killing.” (R. 1649.) Clearly, the prosecutor’s argument was a reply to defense counsel’s argument.
“The rule in Alabama is that remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused’s counsel and are in reply to or retaliation for his acts and statements.”,
Minor v. State, 914 So.2d 372, 424-25 (Ala.Crim.App.2004).
The prosecutor’s argument was within the wide range of argument permissible in rebuttal. Bohannon is due no relief on this claim.
C.
Third, Bohannon argues that the following argument by the prosecutor was erroneous:
“And as far as the deterrent effect of incarceration, well, there are people— other people in prison. There are guards, there are other inmates, there are nurses, there are doctors, and there are other people who are potential victims. Locking somebody up is not necessarily preventing a future crime from happening.”
(R. 1653-54.) Bohannon argues that the above argument was an improper argument concerning Bohannon’s future dangerousness.
This argument was made in the prosecutor’s rebuttal closing argument and was a reply-in-kind to an argument made by defense counsel in closing. Defense counsel had stated: “Life without the possibility of parole will make sure that nothing ever happens at the hands of Mr. Bohannon again ... it will be a deterrent as well.” (R. 1652.)
“It is well settled that ‘[a] prosecutor has the right to “reply in kind” to statements made by defense counsel in the defense’s closing argument.’ Newton v. *522 State, [78 So.3d 458, 478] (Ala.Crim.App.2009) (citations and quotations omitted). ‘ “When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.” ’ Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App.1986) (quoting DePoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469-70 (1982-83)).”
Vanpelt, 74 So.3d at 82.
The prosecutor’s argument did not constitute error, much less plain error. Bo-hannon is due no relief on this claim.
XXII.
Bohannon argues that the circuit court’s instructions in the penalty phase of his trial were improper. He raises two arguments in support of this contention.
A.
First, Bohannon argues that the circuit court failed to properly instruct the jury concerning the aggravating circumstances.
Specifically, Bohannon attacks the following instruction:
“The law of this state provides that punishment of the capital offense of two people dying under one scheme or course of conduct satisfies the aggravating feature of capital punishment. '
[[Image here]]
“An aggravating circumstance, as you have heard, which has already been proved in this case, is a circumstance specified by law that indicates or tends to indicate that the defendant should be sentenced to death.”
(R. 1656-57.) Bohannon did not object to the circuit court’s instructions on aggravating circumstances; therefore we review this claim for plain error. See Rule 45A, Ala. R.App. P.
As this Court stated in Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010):
“During its charge, the circuit court instructed the jury that the aggravating circumstance that the murder was committed during a robbery and that two or more persons were murdered by one act or pursuant to one scheme or course of conduct had been proven beyond a reasonable doubt by the jury’s guilty verdicts for those offenses during the guilt phase of the trial. Section § 13A-5-45(e), Ala.Code 1975, provides: ‘[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.’ The circuit court’s instructions in this regard were a correct statement of law. See Calhoun v. State, 932 So.2d 923, 973-74 (Ala.Crim.App.2005).”
114 So.3d at 151.
The circuit court’s charge made clear that only one aggravating circumstance was to be considered by the jury and that that aggravating circumstance had been proven by the jury’s verdict in the guilt phase. Moreover, an aggravating circumstance is necessary to invoke the death penalty. § 13A-45(e), Ala.Code 1975. When an aggravating circumstance is found to exist, the death penalty becomes a possibility, and the aggravating circumstance must be weighed against any mitigating circumstances in making a sentencing determination. The circuit court’s instruction did not constitute error, much less plain error. Bohannon is due no relief on this claim.
B.
Bohannon argues that the circuit court’s instructions and the prosecutor’s argument *523 encouraged the jury to consider the absence of statutory mitigation circumstances as an aggravating circumstance. Specifically, he argues that the court did not instruct the jury not to consider any other aggravating circumstance.
However, the circuit court did give the following instruction:
“[I]f, after a full and fair consideration of all of the evidence, you are not convinced beyond a reasonable doubt that at least one aggravating circumstance exists—and here the aggravating circumstance has already been proved by a reasonable doubt—or that that one aggravating circumstance does not outweigh the mitigating circumstances.... ”
(R. 1666) (emphasis added).
The jury was clearly instructed to consider only one aggravating circumstance— that two or more people were killed during one act or course of conduct. There was no plain error in the circuit court’s instructions on the aggravating circumstance that applied in this case. Bohannon is due no relief on this claim.
Sentencing Order
XXIII.
Bohannon next argues that the circuit court failed to make the statutory determination as required by § 13A-5-47(e), Ala. Code 1975, that the aggravating circumstance outweighed the mitigating circumstances. Specifically, he argues that the circuit court never made the required finding but, instead, stated: “This Court, after weighing the aggravating and the mitigating circumstances as set out above, does not disagree with the jury’s determination.” (C.R. 82.)
The circuit court’s order states:
“This Court has considered and weighed all applicable aggravating and mitigating circumstances. In recommending a sentence of death, the jury determined the aggravating circumstances in this case outweighed the mitigating circumstances. This Court, after weighing the aggravating and mitigating circumstances as set out above, does not disagree with the jury’s determination.”
(C.R. 82.)
It is clear that the circuit court correctly made its own determination that the aggravating circumstance outweighed the mitigating circumstances and accordingly sentenced Bohannon to death. Bohannon is due no relief on this claim.
For the reasons stated in Part XV of this opinion, this case is remanded to the Mobile Circuit Court for that court to vacate one of Bohannon’s capital-murder convictions. Due return should be filed in this Court within 42 days from the date of this opinion.
AFFIRMED IN PART; REMANDED WITH DIRECTIONS.
WINDOM, P.J., and JOINER, J., concur. WELCH and KELLUM, JJ., concur in the result.
On Return to Remand
BURKE, Judge.
On October 23, 2015, this Court affirmed the Mobile Circuit Court’s judgment as to one of Jerry Dewayne Bohannon’s two convictions for capital murder, pursuant to § 13A-5-40(a)(10), Ala.Code 1975, because Bohannon murdered Anthony Harvey and Jerry DuBoise by one act or pursuant to one scheme or course of conduct. The case was remanded, however, with directions for the circuit court to vacate one of Bohannon’s convictions, and sentence, because of a violation of the Double Jeopardy Clause. On remand, the circuit court held a hearing at which Bohannon, his counsel, and the prosecutor were present. Bohannon’s conviction in case no. CC-11-2990 and the sentence imposed in that case *524 were set aside, and the conviction and sentence in .CC-11-2989 were left standing. Therefore, the circuit court properly-complied with this Court’s directions.
Because we were remanding this case, this Court, on original submission, pretermitted a plain-error review of Bo-hannon’s sentencing proceedings as well as a review pursuant to § 13A-5-53, Ala. Code 1975, of the propriety of his capital-murder conviction and his sentence of death. Bohannon was indicted for, and was convicted of, murdering Harvey, and DuBoise by one act or pursuant to one scheme or course of conduct, a violation of § 13A-5-40(a)(10). The jury recommended, by a vote of 11 to 1, that Bohan-non be sentenced to death, The circuit court followed the jury’s recommendation and sentenced Bohannon to death.
The record shows that Bohannon’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
The only aggravating circumstance established in this case was that two or more persons were killed pursuant to one act or pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala.Code 1975. The circuit court found the existence of one statutory mitigating circumstance—namely, that Bohannon had no significant history of prior criminal activity. § 13A-5-51(1), Ala.Code 1975. The circuit court found the following nonstatutory mitigating. circumstances:
“a. Defendant’s character, life, and record: This Court charged the jury that the jury could consider in the penalty phase, as mitigators, that the defendant Bohannon was a good skilled worker who contributed to society, who had done nice things for his family and other people, and had been good to his step: son. The mitigation specialist who testified stated that she had interviewed twenty-five to thirty-five people and-that all the witnesses had nothing but good things to say and she didn’t find anything bad in Bohannon’s background. The Court heard from character witnesses including two retired policemen who believed that the defendant was a good worker and helpful person. The Court also heard from the defendant’s teenage stepson who said he considered the defendant to be a good person and a better parent than his real father. The Court finds that the defendant’s character, life and record are nonstatutory mit-igators -which exist and the Court gives them some weight.
“b. Mercy: While mercy has been considered because of the human condition and a life at risk, there has been nothing other than a generalized request for mercy put. before this Court, which has been considered and given some weight,”
(C. 80-81.) The circuit court found that the aggravating circumstance outweighed the mitigating circumstances and sentenced Bohannon to death.
• This Court has independently weighed the-aggravating circumstance and the mitigating circumstances, as .required by §■ 13A-5-53(b)(2), Ala.Code 1975, and is convinced, as was the circuit court, that death was the appropriate sentence for the double homicide of Harvey and DuBoise.
Additionally, Bohannon’s death sentence is neither disproportionate nor excessive as compared to the penalties imposed in similar cases. See Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003).
Last, as required by .Rule 45A, Ala. R.App, P., this Court has searched the record for any error that might have af- *525 feeted Bohannon’s substantial rights, and we have found none.
Accordingly, Bohannon’s sentence as to his conviction in case no. CC-11-2989 is hereby affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. "The term 'death qualified’ jury has been used to refer to a jury from which prospective jurors have been excluded for cause on the basis of their opposition to the death penalty.’,’ State v. Griffin, 251 Conn. 671, 673, n. 2, 741 A.2d 913, 917 n. 2 (1999).

. To protect the anonymity of the jurors, we are using their initials.

. Pursuant to Rule 18.2(b), Ala, R.Crim. P., this Court requested that the Mobile County circuit clerk forward the juror questionnaires to this Court.

. More recently, this Court has found no merit to an appellant’s claim that the Mobile District Attorney’s Office had a history of discriminatory jury striking. See Dotch v. State, 67 So.3d 936, 982 (Ala.Crim.App.2010) ("none of the cases cited by Dotch as indicating a history of discrimination occurred within the last decade or involved the prosecutor in Dotch’s case”).

. Res gestae is not one of the grounds listed in Rule 404(b), Ala. R. Evid.

. In fact, defense counsel relied on the results of the toxicology report to such an extent that during closing statements, the prosecutor stated: "As far as the methamphetamine use of these two individuals. The defense attorney exaggerated the significance of the toxicology results and ignored what Dr. Harper, an expert in forensic toxicology, told you....” (R. 1493.)

. In fact, the circuit court instructed the jury that: “You're not required to leave your common sense out here when you retire to deliberate. On the contrary. The law calls upon jurors to use all of your combined wisdom, experience and common sense in sifting through the evidence, accepting the true and rejecting the false,” (R. 1512.)

. The record also shows that defense counsel requested the following jury charge be given to the jury:
"I charge you, members of the jury, that a person is justified in using deadly physical force upon another person in order to defend himself from what he reasonably believes to be the use of imminent use of unlawful deadly physical force by such other person, and he knows or it reasonably appears that he cannot avoid the necessity of using such force with complete safety by retreating, and, he was free from all fault in bringing on the difficulty.”
(C.R. 147.)

. Bobo described, the 2006 amendment to Alabama’s .self-defense law, as follows:, “Instead of the defendant carrying the initial burden to produce evidence showing that a reasonable person would have believed his or her life was in danger, the burden now rests on the prosecution to rebut the presumption that the defendant was justified in using deadly force in self-defense,” 38 Cumb. L.Rev. at 361.

. Bohannon also argues that the circuit court's instructions on the verdict forms were erroneous. Bohannon did not object to the circuit court's instructions on the verdict forms or the verdict forms themselves. For the reasons stated in this part of the opinion we likewise find no plain error in the court’s instructions on the verdict forms.